ORIGINAL

FILED
APR 2 8 2008
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTH HILLS TERRACE, INC.

V. NO. 08-215C
CHIEF JUDGE EDWARD J. DAMICH

THE UNITED STATES

**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND BREACH OF CONTRACT**

Comes the Plaintiff, by and through its attorney, John H. Bell, and for its Declaratory Judgment Amended Complaint, states as follows:

1. Plaintiff brings this action pursuant to § 18 U.S.C. 2201, providing: "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

2. North Hills Terrace, Inc. is a private, nonprofit corporation authorized to do business in the state of Arkansas at 3998 Harrison, Batesville, Arkansas 72501.

3. The Secretary of The United States Department of Housing and Urban Development [hereinafter "HUD"] is Alphonso Jackson located at 451 7th Street S.W., Suite 10000, Washington D.C.

4. Plaintiff hereby seeks a declaration of its rights pursuant to the Project Rental Assistance Contract (hereinafter PRAC) entered into between North Hills Terrace, Inc. and HUD on June 4, 2003, a copy of which is attached hereto and incorporated herein as Exhibit A.

5. HUD has waived any claim of sovereign immunity by virtue of its entry

into contract with Plaintiff. Plaintiff is required pursuant to its Regulatory Agreement with HUD to obtain prior written consent from HUD before filing any action against a third party seeking either compensation in excess of $5,000.00 or equitable relief. Plaintiff is not subject to this requirement in this action as HUD is not a third party, furthermore, plaintiff submits the law cannot require a party to a contract to seek permission of the other party to a contract prior to suing for a breach of contract or determination of rights pursuant to that contract. Finally, plaintiff has written numerous letters to HUD officials, attached as Exhibit B, putting HUD on notice of this action.

6. HUD has breached and is continuing to breach specific contract terms which has resulted and may result in significant damage to Plaintiff exceeding the amount required for federal diversity jurisdiction.

7. Section 202 of the Housing Act of 1959 (codified at 12 U.S.C. § 1701q-2) provides grants for construction of or substantial capital repairs to eligible multifamily projects with elderly tenants that are needed to rehabilitate, modernize, or retrofit aging structures, common areas or individual dwelling units.

8. The purpose of these grants is to "enable elderly persons to live with dignity and independence by expanding the supply of supportive housing that is designed to accommodate the special needs of elderly persons; and provides a range of services that are tailored to the needs of elderly persons occupying such housing." 12 U.S.C. § 1707q(a)(1)-(2).

9. The assistance provided by these grants may

> be used to finance the construction, reconstruction, or moderate or substantial rehabilitation of a structure or a portion of a structure, or the acquisition of a structure from the Resolution Trust Corporation, to be used as supportive housing for the elderly in accordance with this section. Assistance

> may also cover the cost of real property acquisition, site improvement, conversion, demolition, relocation, *and other expenses that the Secretary determines are necessary to expand the supply of supportive housing for the elderly*. *See* 12 U.S.C. § 1707q(b) [emphasis added].

10. Plaintiff North Hills Terrace is a 12-unit Section 202 Capital Advance Property with rental assistance provided by the PRAC for all units located in Hardy, Arkansas, operating pursuant to a Regulatory Agreement, entered into between the parties on October 21, 2002. A copy of the Regulatory Agreement is attached hereto and incorporated herein as Exhibit C.

11. Pursuant to the PRAC, North Hills Terrace agreed to lease the contract units to eligible disabled persons (families) for occupancy by such families solely as private dwellings and as their principal place of residence. See Exhibit A, § 2.2(a).

12. Pursuant to the PRAC, HUD agreed to make project rental assistance payments on behalf of families for the contract units "to enable the families to lease decent, safe and sanitary housing." See Exhibit A, § 2.2(a)(1).

13. The Regulatory Agreement sets forth the requirements necessary for North Hills Terrace ("Mortgagor," as referred to within the Agreement) to accept the capital advance by HUD and the disbursement of any part thereof. See Exhibit C.

14. North Hills Terrace received permission to occupy on June 9, 2003, but only recently reached sustaining capacity.

15. Pursuant to the Regulatory Agreement, North Hills Terrace is required to submit an operating budget to HUD for the fiscal year not later than 30 days prior to the beginning of each fiscal year. *See* Exhibit C, ¶ 3.

16. Pursuant to Paragraph 3 of the Regulatory Agreement,

> the budget shall include all necessary operating expenses, current maintenance charges, expenses of reasonable upkeep and repairs, taxes and special assessment levies, prorated amounts required for insurance and all other expenses incident to the operation of the project; and shall show the expected revenue to pay such expenses, including reserve fund deposits. *See* Exhibit C, ¶ 3.

17. On September 22, 1992, HUD transmitted the Handbook 4350.1 REV-1, Multifamily Asset Management and Project Servicing, replacing and renaming the former version of Handbook 4350.1, formerly entitled, Insured Project Servicing Handbook, dated September 1970. A copy of the transmittal memo for the Multifamily Asset Management and Project Servicing is attached hereto and incorporated herein as Exhibit D.

18. According to the transmittal memo, this Handbook is "the primary handbook used by Field Office Loan Management staff in fulfilling their asset management and loan servicing (loan administration) responsibilities in assisting managing agents and owners to maintain multifamily projects in good physical and sound financial condition." *See* Exhibit D, ¶ C.

19. The HUD Handbook, however, "is not all inclusive and should be used in conjunction with a number of other HUD issuances." *See* Exhibit D, ¶ C.

20. Chapter 7 of the HUD Handbook, entitled "Processing Budgeted Rent Increases and Fees For Commercial Space and Services in Insured, Direct Loan and Non-Regulated HUD Projects", sets forth the procedures that apply to Section 202 projects, including North Hills Terrace, for processing budgeted rent increases in certain HUD projects and outlines guidance in the calculation of utility allowances and charges for commercial facilities and services provided in those projects. A copy of Chapter 7 of the

HUD Handbook is attached hereto and incorporated herein as Exhibit E. See specifically ¶¶ 7-1, 7-2(B).

21. Chapter 7, Paragraph 7-1 provides "HUD's prime interest is in promoting the efficient management and continued financial viability of its projects. *In reviewing requests from owners concerning rents and charges, the Field Office should be guided by the fact that these rents and fees should and must provide sufficient and adequate funding to operate the projects.*" *See* Exhibit E, ¶ 7-1 [emphasis added].

22. Further, 12 U.S.C. § 1707q(2) (1998) states:

> that "[c]ontracts for project rental assistance shall obligate the Secretary to make monthly payments to cover any part of the costs attributed to units occupied (or, as approved by the Secretary, held for occupancy) by very low-income elderly persons that is not met from project income . . . . *The Secretary may adjust the annual contract amount if the sum of the project income and the amount of assistance payments available under this paragraph are inadequate to provide for reasonable project cases.*" [emphasis added]

23. Pursuant to the procedures set forth in the PRAC, Regulatory Agreement and HUD Handbook, on September 21, 2004, North Hills Terrace submitted its Operating Budget for the fiscal year beginning January 1, 2005, and ending December 31, 2005, requesting a rent increase to cover operating expenses. The Operating Budget, in a format provided by HUD, included a line item for vacancies in the property. A copy of the transmittal letter and Operating Budget are attached hereto and incorporated herein as Exhibit F.

24. The rent increase requested was based on actual revenues and related expenses for the North Hills Terrace property for six (6) months of 2003 and eight (8) months of 2004. *See* Exhibit F.

25. The vacancy allowance in the operating budget submitted by North Hills Terrace was denied by HUD, pursuant to a provision in the HUD HANDBOOK providing that vacancy losses are not allowed when considering budget-based rent increases. *See* Exhibit E, ¶ 7-30(M). A copy of the November 29, 2004, letter from Jeanette Liles, Project Manager for HUD, denying the vacancy allowance is attached hereto an incorporated herein as Exhibit G.

26. The language contained in the 1992 HUD Handbook, however, is contradictory to the PRAC, to HUD's own website, and to the statutory authority set forth in 12 U.S.C. § 1707q.

27. First, said language from this 1992 HUD Handbook is contradictory to the language regarding the consideration of vacancies in the PRAC, a contract which was entered into between North Hills Terrace and HUD over ten (10) years after the HUD Handbook was updated, and provides, in relevant part:

> Whenever a HUD-approved estimate of the required annual payments for a fiscal year exceeds the maximum annual commitment for that fiscal year plus the current balance in the project account, HUD will, within a reasonable period of time, take such additional steps as may be necessary to assure that payments under the Contract will be adequate to cover increases in Operating Expenses and decreases in tenant payments.

*See* Exhibit A, § 2.3(b)(2).

28. Furthermore, the PRAC states, "[t]he project rental assistance payment will cover the difference between the Operating Expenses and tenant payments as determined in accordance with the HUD-established schedules and criteria.

29. Additionally, Paragraph 2.7(a) of the PRAC provides:

> Project rental assistance payments will be increased commensurate with adjustments in operating expenses under this section up to the maximum amount authorized under section 2.3(a) of this Contract. HUD will

> calculate operating expense adjustments based on the sum of the costs for operating the project (as approved by HUD) *with adjustments for vacancies*, the project's non-rental income, and other factors that HUD deems appropriate. *See* Exhibit A [emphasis added].

30. Moreover, the PRAC states, "[t]he execution of this Contract by HUD is an assurance by HUD to the Owner that the faith of the United States is solemnly pledged to the payment of project rental assistance payments pursuant to this Contract. . . ." *See* Exhibit A, § 1.3.

31. Second, said language from the 1992 HUD Handbook is contradictory to the language contained on HUD's own website, providing "[p]roject rental assistance funds are provided to cover the difference between HUD-approved operating cost for the project and the tenants' contribution to rent." *See* HUD's website, located at http://www.hud.gov/offices/hsg/mfh/progdesc/eld202.cfm, a printed copy of which is attached hereto and incorporated herein as Exhibit H.

32. Third, the language from the 1992 HUD Handbook is contradictory to 12 U.S.C. § 1707q(c)(2), providing:

> "[c]ontracts for project rental assistance shall obligate the Secretary to make monthly payments to cover any part of the costs attributed to units occupied (or, as approved by the Secretary, held for occupancy) by very low-income elderly persons that is not met from project income . . . . *The Secretary may adjust the annual contract amount if the sum of the project income and the amount of assistance payments available under this paragraph are inadequate to provide for reasonable project costs."* [emphasis added]

33. Based on the doctrine of merger, Plaintiff affirmatively asserts that the PRAC incorporates and supersedes any prior contradictory agreement.

34. Based on the language contained in the PRAC, the parties clearly intended that vacancies, or lack of tenant income, be considered in establishing rental subsidies.

35. Additionally, the clear reading of both the HUD Handbook and the PRAC establish that HUD is responsible for the operating expenses of the properties not covered by tenant's rent.

36. Plaintiff affirmatively asserts that it has marketed the units or spaces in substantial compliance with the HUD-approved Affirmative Fair Housing Marketing Plan and all fair housing and equal opportunity requirements.

37. Further, Plaintiff affirmatively asserts that it has taken and continues to take all feasible actions to fill the property as evidenced by its current 100% occupancy rate.

38. Moreover, Plaintiff affirmatively asserts that it has not rejected any eligible applicant except for good cause acceptable to HUD.

39. In spite of Plaintiff's efforts to occupy the vacancies in the property, Plaintiff has sustained and may in the future sustain significant losses due to the operating shortfalls of this property and HUD's continued failure to compensate Plaintiff for the operating expenses of the properties which are not paid with tenant rental payments as set forth in the PRAC.

40. Additionally, Plaintiff submits that the Special Vacancy Claims allowed by HUD may be inadequate to make up for the differences between the tenant share of rents plus current HUD subsidies, and total operating expenses, because these are limited to sixty (60) days per vacancy incident, and for only 50% of the operating rent. *See* Exhibit A, § 2.4(c).

41. As such, Plaintiff respectfully requests a declaration by this Court that the Project Rental Assistance Contract entered into between North Hills Terrace, Inc. and

HUD on June 4, 2003, does provide a rent increase to account for expected vacancies so that the project may cover the approved projected expenses, and that the language contained in HUD Handbook 4350.1, Chapter 7, Paragraph 7-30(M) that states, "Note: There are no vacancy factors for Section 202 projects with 100 percent section 8" is inapplicable and superseded by the PRAC based on the doctrine of merger.

42. Additionally, Plaintiff submits that it is also entitled to any and all accumulated debt resulting from operating deficiencies since the commencement of operations.

43. Additionally, Plaintiff submits that this Court should require HUD to consider budgeted vacancies when considering budget-based rent increases and that HUD should be required to transmit to each owner and management agent of Section 202 properties said change in policy and practice.

44. Further, Plaintiff requests that this Court require HUD to develop and transmit a form whereby other Section 202 properties may submit to HUD a claim for reimbursement of accumulated debt or operating deficiencies resulting from insufficient subsidies.

WHEREFORE, for the reasons stated herein, Plaintiff respectfully requests that it be granted a declaration of its rights pursuant to its Project Rental Assistance Contract with HUD; that this Court order such remedies as are necessary to insure HUD's future compliance with the contract; for its costs and attorney's fees herein expended and for all other relief to which it is entitled.

Respectfully Submitted,

North Hills Terrace, Inc.
Plaintiff

John Bell
Attorney at Law
505 South Elm Street Suite B
Searcy, Arkansas 72143
501-268-3055
501-268-3458 FAX

By: ______________________
John Bell, AR Bar No. 95139

# Part II of the Project Rental Assistance Contract

Section 202 Supportive Housing for the Elderly
Section 811 Housing for Persons with Disabilities

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

| Type of Project | PRAC Contract No. | HUD Project No. |
|---|---|---|
| x New Construction<br>☐ Substantial Rehabilitation<br>☐ Acquisition | AR37S001005 | 082EE118 |

**2.1 Owner's Warranties, Amendments.**

(a) Legal Capacity. The Owner warrants that it has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

(b) Completion of Work. The Owner warrants that the project as described in section 1.1 is in good and tenantable condition and that the project has been completed in accordance with the terms and conditions of the Capital Advance Agreement (Agreement) or will be completed in accordance with the Special Conditions for Acceptance (see attached exhibit, where applicable). The Owner further warrants that it will remedy any defects or omissions covered by this warranty if called to its attention within 12 months of the effective date of this Contract. The Owner agrees that the continuation of this Contract shall be subject to the Owner meeting any Special Conditions for Acceptance.

**2.2 Families To Be Housed.**

(a) Families To Be Housed. If a Section 811 project, the Contract Units are to be leased by the Owner to eligible Disabled Persons (Families) for occupancy by such Families solely as private dwellings and as their principal place of residence. If a Section 202 project, the Contract Units are to be leased to eligible elderly Persons or Households (Families) solely.

(1) HUD hereby agrees to make project rental assistance payments on behalf of Families for the Contract Units, to enable the Families to lease Decent, Safe, and Sanitary housing pursuant to Section 202 or Section 811.

(2) If there is a Utility Allowance and if the Allowance exceeds the tenant payment, the Owner shall pay the Family the amount of the excess. HUD will pay funds to the Owner in trust solely for the purpose of making this payment.

**2.3 Maximum Project Rental Assistance Commitment: Project Account.**

(a) Maximum Annual Contract Commitment. Notwithstanding any other provisions of this Contract (other than paragraph (b)(2) of this section) or any provisions of any other contract between HUD and the Owner, HUD shall not be obligated to make and shall not make any project rental assistance payments under this Contract in excess of the amount identified in section 1.1 (c). However, this amount may be reduced commensurately with any reduction in the number of Contract Units or in the Operating Expense Amount or pursuant to any other provisions of this Contract.

(b) Project Account.

(1) A project account will be established and maintained by HUD, as a specifically identified and segregated account for the project. The account will be established and maintained, in an amount determined by HUD, out of the amounts by which the Maximum Annual Contract Commitment under section 1.1(c) exceeds the amount actually paid out under the Contract each fiscal year. Payments will be made from the account for project rental assistance payments when needed to cover increases in Operating Expense Amounts or decreases in tenant payments and for other costs specifically approved by the Secretary.

(2) Whenever a HUD-approved estimate of the required annual payments for a fiscal year exceeds the maximum annual commitment for that fiscal year plus the current balance in the project account, HUD will, within a reasonable period of time, take such additional steps as may be necessary to assure that payments under the Contract will be adequate to cover increases in Operating Expenses and decreases in tenant payments.

(3) Any amount remaining in the account after payment of the last project rental assistance payment with respect to the project shall be applied by HUD in accordance with law.

**2.4 Project Rental Assistance Payments To Owners.**

(a) Project Rental Assistance Payments on Behalf of Families.

(1) Project assistance payments shall be paid to the Owner for units (or residential space in a group home under Section 811) under lease for occupancy by Families in accordance with the Contract. The project rental assistance payment will cover the difference between the Operating Expenses and tenant payments as determined in accordance with the HUD-established schedules and criteria.

(2) The amount of project rental assistance payment payable on behalf of a Family and the amount of tenant payment shall be subject to change by reason of changes in Family Income, Family composition, extent of exceptional medical or other unusual expenses or program rules in accordance with the HUD-established schedules and criteria; or by reason of a change in any applicable Utility Allowance approved or required by HUD. Any such change shall be effective as of the date stated in a notification of the change to the Family, which need not be at the end of the Lease term.

(b) Vacancies During Rent-up. If a Contract Unit (or residential space in a group home under Section 811), is not leased as of the effective date of the Contract, the Owner is entitled to assistance payments in the amount of 50 percent of the Operating Expense for the unit (or pro rata share of the Operating Expense for a group home) for a vacancy period not exceeding 60 days from the effective date of the Contract, provided that the Owner: (1) commenced marketing and otherwise compiled with section 2.2(d) of the Agreement;



EXHIBIT
A

(2) has taken and continues to take all feasible actions to fill the vacancy, including, but not limited to, contacting applicants on its waiting list, if any, requesting appropriate sources to refer eligible applicants, and advertising the availability of the unit in a manner specifically designed to reach eligible families; and (3) has not rejected any eligible applicant except for good cause acceptable to HUD.

(c) Vacancies After Rent-up. If an eligible family vacates an assisted unit (or residential space in a group home) the Owner is entitled to vacancy payments in the amount of 50 percent of the Operating Expense (or pro rata share of the Operating Expense in a group home) for the first 60 days of vacancy if the Owner:

(1) Certifies that it did not cause the vacancy by violating the lease, the Contract, or any applicable law;

(2) Notified HUD of the vacancy or prospective vacancy and the reasons for the vacancy immediately upon learning of the vacancy or prospective vacancy;

(3) Has fulfilled and continues to:

(i) market the vacant units or spaces in accordance with the HUD-approved Affirmative Fair Housing Marketing Plan (AFHMP) and all fair housing and equal opportunity requirements. The purpose of the plan and requirements is to achieve a condition in which eligible families of similar income levels in the same housing market have a like range of housing choices available to them regardless of their race, color, creed, religion, handicap, age, familial status, sex or national origin.

(ii) Submits to HUD a list of leased and unleased assisted units (or in the case of a group home, leased and unleased residential spaces) with a justification for the unleased units or residential spaces, in order to qualify for vacancy payments for the unleased units or residential spaces.

(iii) Has taken and continues to take all feasible actions to fill the vacancy; and
(iv) Has not rejected any eligible applicant except for good cause acceptable to HUD.

(4) For any vacancy resulting from an Owner's eviction of an eligible family, certifies that it has complied with the provisions at 24 CFR Part 247 which apply to all decisions by an Owner to terminate the tenancy or modify the lease of a family residing in a unit (or residential space in a group home).

(d) Prohibition of Double Compensation for Vacancies. The owner is not entitled to payments for vacant units to the extent it collects for the vacancy from other sources (tenant payment, security deposits, reimbursements from HUD for unpaid operating expense amount, other amounts collected from the Family, and government payments under other programs). If the Owner collects any of the Family's share of the tenant payment for a vacancy period in an amount which, when added to the vacancy payment, results in more than the Operating Expense Amount, the excess must be reimbursed as HUD directs.

(e) HUD Not Obligated for Tenant Payments. HUD has not assumed any obligation for the amount of tenant payment or the satisfaction of any claim by the Owner against any Family other than in accordance with section 2.3(b) of this Contract. The financial obligation of HUD is limited to making project rental assistance payments on behalf of Families in accordance with this Contract.

(f) Owner's Monthly Requests for Payments.

(1) The Owner shall submit monthly requests to HUD for project rental assistance payments. Each request shall set forth; (i) the name of each Family and the address and/ or number of the unit (or residential space in a group home) leased by the Family; (ii) the address and/or the number of each unit, if any, not leased to Families for which the Owner is claiming payments; (iii) the Operating Expense Amount as set forth in Exhibit I for each unit for which the Owner is claiming payments; (iv) the amount of tenant payment by the Family leasing the unit (or, where applicable, the amount to be paid the Family in accordance with section 2.2(a)(2); and (v) the total amount of project rental assistance payments requested by the Owner. (The total amount of project rental assistance payments requested equal total HUD-approved operating expenses for the project minus the tenant payments received from all units (see (iv) above).)

(2) Each of the Owner's monthly requests shall contain a certification by it that to the best of its knowledge and belief (i) the dwelling units are in Decent, Safe, and Sanitary condition, (ii) all the other facts and data on which the request for funds is based are true and correct, (iii) the amount requested has been calculated in accordance with the provisions of the Contract and is payable under the Contract, (iv) none of the amount claimed has been previously claimed or paid under this Contract, and (v) the Owner has not received and will not receive payments or other consideration from the Family, HUD or any other public or private source for the unit beyond that authorized in this Contract and the lease.

(3) If the Owner has received an excessive payment, HUD, in addition to any other rights to recovery, will deduct the amount from any subsequent payment or payments.

(4) The Owner's monthly requests for project rental assistance payments are subject to penalty under 18 U.S.C. 1001, which provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United Stated shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

2.5 Maintenance, Operation And Inspection.

(a) Maintenance and Operation. The Owner agrees to maintain and operate the Contract Units and related facilities to provide decent, safe, and sanitary housing including the provision of all the services, maintenance and utilities set forth in section 1.1(e). If a Section 811 project, the Owner also agrees to comply with the lead-based paint regulations at 24 CFR Part 3 5 and 24 CFR Part 890. If HUD determines that the Owner is not meeting one or more of these obligations, HUD shall have the right to take action under section 2.24(a).

(b) Inspection. Prior to occupancy of any Contract Unit by a Family, the Owner and the Family shall inspect the unit and

both shall certify, on forms prescribed or approved by HUD, that they have inspected the unit and have determined it to be decent, safe, and sanitary in accordance with the criteria provided in the forms. The Owner shall keep copies of these reports on file for at least three years.

(c) Units Not Decent, Safe and Sanitary. If HUD notifies the Owner that it has failed to maintain a dwelling unit in decent, safe, and sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, HUD may exercise any of it rights or remedies under the Contract, including reduction or suspension of project rental assistance payments, even if the Family continued to occupy the unit. If, however, the Family wishes to be rehoused in another dwelling unit with assistance and HUD does not have other funds for such purposes, HUD may use the abated project rental assistance payments for the purpose of rehousing the Family in another dwelling unit. If the Family continues to occupy the unit, it will do so in accordance with the terms of its lease, including the termination date and amount of tenant payments.

(d) Notification of Abatement. Any reduction or suspension of project rental assistance payments shall be effective as provided in written notification to the Owner. The Owner shall promptly notify the Family of any such abatement.

(e) Overcrowded and Under-occupied Units. Where the Owner determines a unit is larger or smaller than appropriate for an eligible family, the Owner agrees, if possible, to offer the family an appropriate alternate unit as promptly as possible in accordance with HUD regulations and requirements in effect at the time of the determination.

**2.6 Financial Requirements.**

(a) Submission of Financial and Operating Statements.
The Owner must submit to HUD:

(1) Within 60 days after the end of each fiscal year of project operations, financial statements for the project audited by an Independent Public Accountant in the form required by HUD, and

(2) Other statements as to project operation, financial condition and occupancy as HUD may require to administer this Contract and to monitor project operations.

(b) Use of Project Funds.

(1) The Owner shall maintain a project fund account in a HUD-approved depository and shall deposit all tenant payments, charges, income and revenues arising from project operation or ownership in this account. Project funds must be used for the operation of the project (including required insurance coverage), to pay operating expenses, and to make required deposits to the replacement reserve in accordance with paragraph (c) of this section. To the extent HUD determines that project funds are more than needed for these purposes, the surplus project funds must be deposited with a HUD-approved depository in an interest-bearing residual receipts account. Withdrawals from this account will be made only with the approval of HUD and for project purposes, including the reduction of project rental assistance payments. Upon termination of the Contract, any excess funds must be remitted to HUD.

(c) Replacement Reserve.

(1) The Owner shall establish and maintain a replacement reserve in an interest-bearing account to aid in funding extraordinary maintenance and repair and replacement of capital items in accordance with applicable regulations.

(i) The Owner shall make monthly deposits to the replacement reserve commencing on the effective date of the Contract. For staged projects, the deposits shall commence on a pro rata basis for units in each stage on the effective date of the Contract for that stage.

(ii) The reserve must be built up to and maintained at a level determined by HUD to be sufficient to meet projected requirements. Should the reserve reach that level, the amount of monthly deposit to the reserve may be reduced with HUD approval.

(iii) Replacement reserve funds must be deposited with HUD or a HUD-approved depository in an interest-bearing account. All interest earnings must be added to the reserve.

(iv) Funds may be withdrawn from the reserve and used only in accordance with HUD guidelines and with the approval of, or as directed by, HUD.

(d) The Owner is not entitled to distributions of project funds.

**2.7 Operating Expense Adjustments.**

(a) Funding of Adjustments. Project rental assistance payments will be increased commensurate with adjustments in operating expenses under this section up to the maximum amount authorized under section 2.3(a) of this Contract. HUD will calculate operating expense adjustments based on the sum of the costs for operating the project (as approved by HUD) with adjustments for vacancies, the project's non-rental income, and other factors that HUD deems appropriate. The calculation will be made on the basis of the information provided by the Owner on a form prescribed by HUD.

(b) Operating Expense Adjustments. Operating Expenses shall be adjusted whenever HUD approves an increase in operating costs as provided under the Regulatory Agreement.

(c) Incorporation of Operating Expense Adjustment. Any adjustment in Operating Expenses shall be incorporated into Exhibit I by a dated addendum to the exhibit establishing the effective date of the adjustment.

(d) Adjustment of Operating Expense Based on Cost Certification. The Owner shall complete the cost certification requirements under 24 CFR part 889 (Section 202) or 24 CFR 890 (Section 811).

(e) Adjustment of Operating Expense Amounts Due to Tax Exemption. The Operating Expense Amounts may be reduced to reflect real property tax exemption or similar savings where the initial operating expenses were approved on the assumption that the project would not receive the benefit of the tax abatement or similar savings. The Owner agrees to notify HUD in the event the project begins to receive such an exemption or similar savings so the Initial Operating Expense Amounts then in effect may be reduced.

**2.8 Marketing And Leasing Of Units.**

(a) Compliance with Equal Opportunity Requirements. Marketing of units and selection of Families by the Owner shall be in accordance with the Owner's HUD-approved Affirmative Fair Housing Marketing Plan (if required), shown as an exhibit, and with all regulations relating to fair housing advertising. Projects shall be managed and operated without regard to race, color, religion, creed, age, sex, handicap, familial status or national origin, except housing provided under Section 202 must be limited to households where at least one person is 62 years of age or older.

(b) Security Deposits. The Owner agrees to comply with applicable HUD regulations (24 CFR Part 889 or 890) and other requirements, as revised from time to time, regarding security deposits and to comply with all State and local law.

(c) Eligibility, Selection and Admission of Families.

(1) The Owner shall be responsible for determination of eligibility of applicants, selection of families from among those determined to be eligible, computation of the amount of project assistance payments on behalf of each selected Family and of total Family contributions and record-keeping in accordance with applicable HUD regulations and requirements.

(2) The Owner shall not charge any applicant or assisted Family any amount in excess of the total Family contribution except as authorized by HUD.

(3) The Owner must accept applications for admission to the project in the form prescribed by HUD. Applicant families applying for assisted units (or residential spaces in a group home) must complete a certification of eligibility as part of the application for admission. Both the Owner and the applicant family must sign the application for admission. On request, the Owner must forward to HUD copies of these applications for admission.

(4) The Lease entered into between the Owner and each selected Family shall be on the form of Lease approved by HUD and must contain all of the required provisions and none of the prohibited provisions specified in HUD issuances. The term of the lease may not be less than one year.

(5)

(i) The Owner shall make a reexamination of Family income, composition, and the extent of medical or other unusual expenses incurred by the Family at least every 12 months and appropriate redeterminations shall be made by the Owner of the amount of Family contribution and the amount of project rental assistance payments, all in accordance with applicable HUD regulations and requirements.

(ii) If a Family reports a change in income or other circumstances that would result in a decrease of total Family contribution between regularly scheduled reexaminations, the Owner, upon receipt of verification of the change, must promptly make appropriate adjustments in the total Family contribution. The Owner may require in its lease that Families report increases in income or other changes between scheduled reexaminations.

(iii) A Family's eligibility for project rental assistance payments continues until its total Family contribution equals the total housing expense for the unit it occupies (or a pro rata share of the operating expense in a group home). The termination of subsidy eligibility at this point will not affect the Family's other rights under the lease nor preclude resumption of subsidy payments as a result of later changes in income or other circumstances during the term of this Contract.

(6) The Owner will maintain as confidential all information relating to applicants and assisted Families, the disclosure of which would constitute an unwarranted invasion of personal privacy.

(d) Redetermination of Operating Expense after Adjustment in Utility Allowances. In the event that the Owner is notified of a HUD determination approving or requiring an adjustment in the Utility Allowance applicable to any of the Contract Units, the Owner shall promptly make a corresponding adjustment in the amount of tenant payment to be paid by the affected Families and the amount of project rental assistance payments.

(e) Processing of Applications and Complaints. The Owner shall process applications for admission, notifications to applicants, and complaints by applicants in accordance with applicable HUD regulations and requirements and shall maintain records and furnish such copies or other information as may be required by HUD.

(f) Reviews; Incorrect Payments. In making project rental assistance payments to Owners, HUD will review the Owner's determinations under this section. If, as a result of this review or other reviews, audits or information received by HUD at any time, it is determined that the Owner has received improper or excessive assistance payments, HUD shall have the right to deduct the amount of such overpayments from any amounts otherwise due the Owner, or otherwise effect recovery.

**2.9 Termination of Tenancy or Project Rental Assistance by the Owner.**

The Owner agrees not to terminate any tenancy of or assistance on behalf of an assisted Family except in accordance with all HUD regulations and other requirements in effect at the time of the termination, and any State and local law. Terminations of tenancy are subject to 24 CFR Part 247.

**2.10 Nondiscrimination.**

The Owner shall comply with:

(a) The requirements of the Fair Housing Act (42 U.S.C. 3601-19) and its implementing regulations at 24 CFR Part 100; Executive Order No 11063 (Equal Opportunity in Housing) and implementing regulations at 24 CFR Part 107; and Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d)(Nondiscrimination in Federally Assisted Programs.) and implementing regulations at 24 CFR Part 1;

(b) The prohibitions against discrimination on the basis of age under the Age Discrimination Act of 1975 (42 U.S.C. 6101-07) and implementing regulations at 24 CFR Part 146, and the prohibitions against discrimination against otherwise

qualified individuals with handicaps under section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and implementing regulations at 24 CFR Part 8.

(c) The requirements of Executive Order No. 11246 (Equal Employment Opportunity) and the regulations issued under the Order at 41 CFR Chapter 60;

(d) The requirements of section 3 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701u) (Employment Opportunities for Lower Income Persons in Connection with Assisted Projects) and the implementing regulations at 24 CFR Part 135;

(e) The requirements of Executive Order Nos. 11625, 12432, and 12138 (Minority and Women's Business Enterprises);

(f) The affirmative fair housing marketing requirements of 24 CFR Part 200, Subpart M and the implementing regulations at 24 CFR Part 108;

(g) The fair housing advertising and poster guidelines, 24 CFR Parts 109 and I 10; and

(h) The civil rights and Equal Opportunity reporting requirements at 24 CFR Part 885.940(f).

**2.11 Cooperation in Equal Opportunity Reviews.**

The Owner agrees to cooperate with HUD in conducting monitoring and compliance reviews and complaint investigations pursuant to or permitted by all applicable civil rights statutes and regulations, Executive Orders, and civil rights related program requirements.

**2.12 National Environmental Policy Act.**

The Owner agrees to comply with all applicable requirements under the National Environmental Policy Act (NEPA) of 1969 (42 U.S.C. 4321 et seq.) and HUD regulation 24 CFR Part 50 including the related environmental laws, Executive Orders and HUD standards in 24 CFR 50.4

**2.13 Flood Disaster Protection Act.**

If the Project is located in an area that has been identified by the Director of the Federal Emergency Management Agency as an area having special flood hazards and if the sale of flood insurance has been made available under the National Flood Insurance Act of 1968, the Owner agrees that it will obtain coverage of the Project, during its anticipated economic or useful life, by flood insurance in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less.

**2.14 Clean Air Act and Federal Water Pollution Control Act.**

In compliance with 'regulations issued by the Environmental Protection Agency (EPA), 40 CFR, Part 15, pursuant to the Clean Air Act, as amended ("Air Act"), 42 U.S.C. 7401, et seq., the Federal Water Pollution Control Act, as amended ("Water Act"), 33 U.S.C. 1251, et seq., and Executive Order 1173, the Owner agrees:

(a) Not to utilize any facility in the performance of this Contract or any nonexempt subcontractor which is listed on the EPA List of Violating Facilities pursuant to Part 15 of the regulations for the duration of time that the facility remains on the list.

(b) Promptly to notify HUD of the receipt of any communication from the EPA indicating that a facility to be utilized for this Contract is under consideration to be listed on the EPA List of Violating Facilities;

(c) To comply with all the requirements of section 114 of the Air Act and section 308 of the Water Act relating to inspection, monitoring, entry, reports, and information, as well as all other requirements specified in section 114 of the Air Act and section 308 of the Water Act, and all regulations and guidelines issued thereunder; and

(d) To include or cause to be included the provisions of this Contract in every nonexempt subcontract and take such action as HUD may direct as a means of enforcing such provisions.

**2.15 Displacement and Relocation Assistance.**

The Owner agrees to comply with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (42 U.S.C. 4601) as amended by the Uniform Relocation Assistance Amendments of 1987, Title IV of the Surface Transportation and Uniform Relocation Assistance Act of 1987 (Pub. L. 100-17, approved April 2,1987) (URA) and government-wide implementing regulations at 49 CFR Part 24 which set forth relocation assistance requirements that apply to the displacement of any person (family, individual, business, nonprofit organization or farm) as a direct result of acquisition, rehabilitation or demolition for a project assisted under this part.

**2.16 Lead-Based Paint.**

The Owner agrees to comply with requirements of the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. 48214846) and implementing regulation at 24 CFR Part 35 to the extent they are applicable to housing under the Contract.

**2.17 Lobbying.**

The Owner agrees to comply with the prohibitions against lobbying the Executive or Legislative Branches of the Federal Government contained in Pub. L. 101-121 (31 USC 1352) and implementing regulations at 24 CFR Part 87.

**2.18 Reports and Access to Premises and Records.**

(a) The Owner shall furnish any information and reports pertinent to this Contract as reasonably may be required from time to time by HUD.

(b) The Owner shall permit HUD or its duly authorized representatives to have access to the premises and, for the purpose of audit and examination, to have access to any books, documents, papers and records of the Owner that are pertinent to compliance with this Contract, including the verification of information pertinent to project rental assistance payments.

**2.19 Disputes.**

Any dispute concerning a question of fact arising under this Contract which cannot be resolved by agreement between the HUD Field Office and the Owner may be submitted by the Owner to the HUD Secretary or a designee. Both parties shall proceed diligently with the performance of this Contract and in accordance with the Field Office's decision, pending resolution of the appeal.

**2.20 Conflicts of Interest.**

Officers, directors, stockholders and authorized representatives of the Owner may not have any financial interest in any contract in connection with the rendition of services, the provision of goods or supplies, project management, procurement of furnishings or equipment, construction of the project, procurement of the site, or other matters related to development and operation of the project.

**2.21 Interest of Member of or Delegate to Congress.**

No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise from it.

**2.22 Assignment, Sale or Foreclosure.**

(a) The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement, or the project or any part of them or any of its Interest in them, without the prior written consent of HUD.

(b) The Owner agrees to notify HUD promptly of any proposed action covered by paragraph (a) of this section and further agrees to request HUD's prior written consent.

(c) Except where otherwise approved by HUD, this Contract and the Agreement shall continue in effect and project rental assistance payments will continue in accordance with the terms of this Contract in the event:

(1) of assignment, sale or other disposition of the project, this Contract or the Agreement,

(2) of foreclosure, including foreclosure by HUD.

(3) of assignments of the mortgage or deed in lieu of foreclosure,

(4) HUD takes over possession, operation or ownership,

(5) of transfer to another nonprofit owner.

**2.23 Defaults by Owner.**

(a) Rights of HUD If Owner Defaults under Contract.

(1) Events of Default. A default by the Owner under this Contract shall result if-

(i) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by HUD in connection with any annual or other inspection; or

(ii) The Owner has asserted or demonstrated an intention not to perform some or all of its obligations under this Contract or under any Lease; or

(iii)The Owner has violated or failed to comply with the regulations for the Section 202 or Section 811 program, with the HUD mortgage, or with the regulatory agreement; or the Owner has filed any false statement or misrepresentation with HUD in connection with the capital advance.

(2) HUD Determination of Default. Upon a determination by HUD that a default has occurred, HUD shall notify the Owner of-

(i) The nature of the default,

(ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default), and

(iii) The time within which the Owner shall respond with a showing that all the required actions have been taken.
If the Owner fails to respond or take action to the satisfaction of HUD, HUD shall have the right to take corrective action to achieve compliance in accordance with paragraph (3) of this section or to terminate this Contract, in whole or in part, or to take other corrective action to achieve compliance in its discretion.

(3) Corrective Actions. Pursuant to paragraph (a)(2) of this section HUD, in its discretion may take the following corrective actions:

(i) Take possession of the project, bring any action necessary to enforce any rights of the Owner growing out of the project operation, and operate the project in accordance with the terms of this Contract until such time as HUD determines that the Owner is again in a position to operate the project in accordance with this Contract. If HUD takes possession, project rental assistance payments shall continue in accordance with this Contract.

(ii) Collect all tenant payments and charges in connection with the operation of the project and use these funds to pay the necessary expenses of preserving the property and operating the project and to pay the Owner's obligations under the note and mortgage or other capital advance documents.

(iii) Apply to any court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with the Contract, or for such other relief as may be appropriate. These remedies are appropriate since the injury to HUD arising from a default under any of the terms of this Contract could be irreparable and the amount of damage would be difficult to ascertain.

(iv) Reduce or suspend project rental assistance payments.

(v) Transfer to another nonprofit owner.

(vi) Recover any overpayments.

(b) Remedies Not Exclusive and Non-Waiver of Remedies. The availability of any remedy under this Contract, shall not preclude the exercise of any other remedy under this Contract or under any provisions of law, nor shall any action taken in the exercise of any remedy be considered a waiver of any other rights or remedies. Failure to exercise any right or remedy shall not constitute a waiver of the right to exercise that or any other right or remedy at any time.

**Part I of the Project**
**Rental Assistance Contract**
Section 202 Supportive Housing for the Elderly
Section 811 Housing for Persons with Disabilities

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

| Type of Project | PRAC Contract No. | HUD Project No. |
|---|---|---|
| x New Construction<br>☐ Substantial Rehabilitation<br>☐ Acquisition | AR37S001005 | 082EE118 |

This Project Rental Assistance Contract (Contract) is entered into between the United States of America acting through the Department of Housing and Urban Development (HUD) and North Hills Terrace, Inc. (Owner) pursuant to

_ Section 811 of the National Affordable Housing Act of 1990 or
X Section 202 of the Housing Act of 1959.

The purpose of this Contract is to provide project rental assistance payments on behalf of Eligible Families leasing decent, safe and sanitary units from the Owner.

**1.1 Significant Date and other Items; Contents and Scope of Contract.**

(a) **Effective Date of Contract:** 06/04/03

(b) **Fiscal Year.** The ending date of each Fiscal Year shall be 12/31 (insert March 31, June 30, September 30, or December 31, as approved by HUD). The Fiscal Year for the project shall be the 12-month period ending on this date. However, the first Fiscal Year for the project is the period beginning with the effective date of the Contract and ending on the last day of the Fiscal Year, which is not less than 12 months after the effective date. If the first Fiscal Year exceeds 12 months, the maximum total annual project rental assistance payment in section 1.1(c) will be adjusted by the addition of the pro rata amount applicable to the period of operation in excess of 12 months.

(c) **Maximum Annual Contract Commitment.** The maximum annual amount of the commitment for project rental assistance payments under this Contract (see section 2.3) is the amount of contract authority identified in Exhibit 2.

(d) **Project Description.** Twelve (12) one-bedroom units for elderly, which consist of two 1-story semi-detached buildings with: slab on grade foundation; wood framing and brick exterior finish.

(e) **Statement of Services, Maintenance and Utilities Provided by the Owner.**

(1) Services and Maintenance:
Cold Water, Parking, trash pick-up and sewer

(2) Equipment:
Range and Oven, Refrigerator, Air Conditioning Equipment, Laundry Facilities in Common Area, Carpet, Drapes

(3) Utilities:

(4) Other:

(f) Contents of Contract. This Contract consists of Part I, Part II and the following exhibits:
Exhibit 1: The schedule showing the number of units by size and, in the case of group homes, residential spaces, (Contract Units) and their applicable operating expenses,
Exhibit 2: The schedule showing contract and budget authority.
Exhibit 3: The Affirmative Fair Housing Marketing Plan



form HUD-90173-A-CA (7/92)
ref Handbooks 4571.5 and 4571.4

Additional exhibits: (Specify additional exhibits, if any, such as Special Conditions for Acceptance. If none, insert "None.")

(g) Scope of Contract. This Contract, including the exhibits, whether attached or incorporated by reference, comprises the entire agreement between the Owner and HUD with respect to the matters contained in it. Neither party is bound by any representations or agreements of any kind except as contained in this Contract, any applicable regulations, and agreements entered into in writing by the parties, which are not inconsistent with this Contract.

1.2 Term of Contract: Obligation to Operate Project for Full Term.

(a) Term of Contract. The initial term of this Contract for any unit shall be 5 years, beginning with the effective date of this Contract for such unit, commitments to extend expiring contracts during the year prior to the date of expiration. If the project is completed in stages, the term shall be separately related to the units in each stage. However, the total Contract term for all the stages, beginning with the effective date of the Contract for the first stage, shall not exceed 22 years.

(b) Obligation to Operate Project for Full Term. The Owner agrees to continue operation of the project in accordance with this Contract for the full term specified in paragraph (a).

1.3 HUD Assurance. The execution of this Contract by HUD is an assurance by HUD to the Owner that:

(a) The faith of the United States is solemnly pledged to the payment of project rental assistance payments pursuant to this Contract, and

(b) HUD has obligated funds for these payments.

Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (118 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

| United States of America<br>Secretary of Housing and Urban Development | Owner: North Hills Terrace, Inc. |
|---|---|
| Signature: | Signature: |
| By: [signature] | By: [signature] |
| Name: | Name: |
| Official Title: Director, Little Rock Multifamily Program Center | President<br>Official Title: |
| Date: 6-25-03 | 6/17/2003<br>Date: |

If the project is to be completed and accepted in stages, execution of the contract with respect to the several stages appears on the following page of this contract.

 form HUD-90173-A-CA

**Stage 1**

**Execution of Contract with Respect to Contract Units Completed and Accepted in Stages**
This Contract is hereby executed with respect to the units described in Exhibit la.
Effective Date: The effective date of this Contract with respect to the units described in Exhibit la.
is .

United States of America
Secretary of Housing and Urban Development
Signature:

By:
Name:

Official Title:

Date:

Owner:
Signature:

By:
Name:

Official Title:

Date:

**Stage 2**

**Execution of Contract with Respect to Contract Units Completed and Accepted in Stages**
This Contract is hereby executed with respect to the units described in Exhibit lb.
Effective Date: The effective date of this Contract with respect to the units described in Exhibit lb.
is

United States of America
Secretary of Housing and Urban Development
Signature:

By:
Name:

Official Title:

Date:

Owner:
Signature:

By:
Name:

Official Title:

Date:

**Stage 3**

**Execution of Contract with Respect to Contract Units Completed and Accepted in Stages**
This Contract is hereby executed with respect to the units described in Exhibit lc.
Effective Date: The effective date of this Contract with respect to the units described in Exhibit lc.
is

United States of America
Secretary of Housing and Urban Development
Signature:

By:
Name:

Official Title:

Date:

Owner:
Signature:

By:
Name:

Official Title:

Date:

**Exhibit 1**

**Schedule of Contract Units and Operating Expense Amounts**[1]

| Number of Bedrooms | Number of Units (or residential spaces in a group home) | Household Type (Elderly, Physically Handicapped, DDs or CMI's) | Operating Expense Amount |
|---|---|---|---|
| 1 | 12 | Elderly | $195 [2] |

[1] This Exhibit must be completed and attached to the Contract at the time the Agreement is executed. It may, however, be amended in accordance with program rules before the Contract is executed. When Operating Expenses change, this format should be used.

[2] The monthly Operating Expense Amount shown herein is based 100% of the applicable Operating Cost Standard in effect at the time of fund reservation. The total amount of the Owner's estimate of monthly expenses is $3,012.

**Exhibit 2**
This Exhibit shows the initial and subsequent amounts of contract and budget authority obligated for project umber: 082EE118

| | | Contract Authority | Budget Authority |
|---|---|---|---|
| As of the Effective Date of | | $27,100[1] | $135,500 |
| Effective Date of Agreement Amendment: | Show Increase or Decrease | $ | $ |
| | Revised Total | $ | $ |
| Effective Date of Agreement Amendment: | Show Increase or Decrease | $ | $ |
| | Revised Total | $ | $ |
| As of the Effective Date of Contract | | $ | $ |
| Effective Date of Contract Amendment: | Show Increase or Decrease | $ | $ |
| | Revised Total | $ | $ |
| Effective Date of Contract Amendment: | Show Increase or Decrease | $ | $ |
| | Revised Total | $ | $ |

[1] The amount of $36,100 obligated for this project represents 75% of the total Operating Cost Standard (OCS) amount of $3,008 as calculated using the applicable OCS in effect at the time of fund reservation. HUD will consider an increase in the Project Rental Assistance Contract and Budget Authority obligated for the project after one full year of project operation, subject to availability of unds.

**Exhibit 3**
Affirmative Fair Housing Marketing Plan

This exhibit is the Affirmative Fair Housing Marketing Plan provided by the Little Rock Multifamily Program Center

**Additional Exhibits**: (Specify, such as: Special Conditions for Acceptance. If none, insert "None.") None

June 3, 2005

Mr. E. Ross Burton
Director
Fort Worth Multifamily Hub
810 Cherry Street, Room 2741
Fort Worth, Texas 76102

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
RESTRICTED DELIVERY

Re: PRAC Contract No.: AR37S001005
HUD Project No.: 082EE118

Dear Mr. Burton:

I have been retained by White River Area Agency on Aging and North Hills Terrace, Inc. On behalf of Mr. Cantrell and White River Area Agency on Aging, I am writing to appeal a rental increase request for Project #082-EE018.

Please note our objection to the position taken by your office that we are required to appeal in this limited manner pursuant to HUD Handbook 4350 REV-1. It is our position that the Contract entered into by and between my client and the USA, Secretary of Housing and Urban Development is clear and unambiguous. Further, there is a merger clause in the contract that stipulates the contract as the entire agreement between the parties. Further, the Contract contains a provision (Sec. 2.19) pursuant to which disputes of fact are to be resolved. There are no disputes of fact in this matter. Accordingly, please understand from the outset our single position that this case involves the clear breach of a contract term by the USA which has resulted and will continue to result in significant damage to my clients. The United States waived her sovereign immunity by entering into the Contract and we intend to enforce our rights pursuant to the Contract by any means necessary.

To that end, please note our affirmative statement that my client has complied and continues to comply with each and every requirement placed upon it by virtue of Sec. 2.4 (c) of the P.R.A.C Contract. If the United States disputes this factual allegation raised by

EXHIBIT

B

my client, then we ask to be made aware of the facts supporting your dispute of this allegation. We shall regard your silence on this matter as an agreement that no factual dispute exists on this issue. (A copy of the contract is attached for convenience.)

Notwithstanding the foregoing, my client wishes to resolve this dispute as amicably as possible and is engaged in this process in that spirit.

Through previous appeals my clients have attempted to raise several issues that have yet to be addressed by your agency. It is our intent to address these issues through your office in an attempt to avoid these issues being raised in a court setting. The issue in contention is whether the vacancy losses of the Project may be included in the proposed budget increase for the following year. The language of the PRAC seems to be specific on this issue and in favor of including the losses. The offices to which we have previously appealed have determined that because of one clause in the HUD Handbook, the losses for vacancies should not be included. The only explanation in the handbook states that there are not vacancies allowed in section 202 projects. The previous decisions have not addressed the discrepancies in the Handbook and the PRAC and have only determined that these losses are not allowed. This would seem to be an issue for a court because of the contractual nature of the PRAC, however we are hoping that this matter may be resolved through your office and, thus saving each interested party time and money.

Throughout the appeals process Mr. Cantrell has written several letters attempting to raise the issues of the conflicting language in the HUD handbook and the PRAC that was signed in regards to this project. Allow me to briefly cover these concerns below:

The HUD Handbook was published in September of 1992, near, or perhaps even before the time the PRAC contract design had been completed. The 4350.1 REV-1 was a document that, with respect to budget based rental increases at least, seems to more closely resemble the terms of the older HAP contracts that were used prior to 1993. The language of those contracts with respect to losses of rental revenues is different than the language in the later PRAC's. It appears that perhaps the language of the handbook has not been updated to account for the language in the PRAC document with respect to revenue losses being a consideration when considering HUD subsidies.

We believe that the Handbook should not contradict itself and hope that you will agree. In the introduction of Chapter 7, it is stated that "*In preparing the procedures in this chapter, HUD's prime interest is in promoting the efficient management and continued financial viability of its projects. In reviewing requests from owners concerning rents and charges, the Field Office should be guided by the fact* ***that these rents and fees should and must provide sufficient and adequate funding to operate the projects.*** *" (Emphasis added)*

It is our belief that these comments are perfectly compatible with the terms of the PRAC.

The language of the PRAC offers:

Paragraph 2.3 (b)(2) states: "Whenever a HUD-approved estimate of the required annual payments for a fiscal year exceeds the maximum annual commitment for that fiscal year plus the current balance in the project account, HUD will within a reasonable period of time, **take such additional steps as may be necessary to assure that payments under the Contract will be adequate to cover increases in Operating Expenses and decrease in tenant payments.**"

Paragraph 2.4(a)(1) states: "...**The project rental assistance payment will cover the difference between the Operating Expenses and tenant payments** as determined in accordance with the HUD-established schedules and criteria."

Perhaps the most prominent support for using vacancies as criteria for determining the rental assistance payments is found in paragraph 2.7 (a) which states... "Project rental assistance payments will be increased commensurate with adjustments in operating expenses under this section up to the maximum amount authorized under section 2.3(a) of this Contract. **HUD will calculate operation expense adjustments based on the sum of the costs for operation the project (as approved by HUD) with adjustments for vacancies**, the project's non-rental income, and other factors that HUD deems appropriate. The calculation will be made on the basis of the information provided by the Owner on a form prescribed by HUD."

Paragraph 2.4 (c) is also instructive in addressing the steps we must take in order to qualify for the Rental Assistance and thus the budget changes.

In summary of all this, it appears that the language in the HUD Handbook 4350.1 REV-1, Chapter 7-30 M where it states that "*There are no vacancy factors for Section 202 projects with 100 percent Section 8*" could be rendered meaningless after the implementation of PRAC type contracts.

From the references in the PRAC, it is clearly intended that vacancies, or lack of tenant income, be considered in establishing rental subsidies. It is also clear both from the Handbook, as well as the contract with HUD, that the design of these properties is such that HUD is responsible for the operation expenses of the properties that the tenant's rent does not provide for. If HUD has accepted a market study that shows support for a property to be constructed and operated in a certain community, and my clients, as management agents, are marketing the property responsibly, then the burden of recurring operating deficits should not be borne on the backs of those management agent/sponsors.

The assertion of your Little Rock's staff that the references to vacancies in the PRAC refer to Special Vacancy Claims seems at least a little ridiculous since those Special Claims are unrelated to operating expenses, and are a revenue source, not an expense item.

My clients as management agents have provided short-term operating loans of approximately $150,000 for our twelve Section 202 properties, and this is a staggering multiple of the Minimum Capital Investment required of them when they agreed to sponsor these projects. Because of operating shortfalls of this one property, it now owes my clients more than $11,000 after only two years in operation on a skeleton budget. Using the rent increase proposed by your agency will result in an expected operating deficiency of more than $10,000 for 2005 alone, an enormous burden on the management agent with little prospect of ever being repaid.

Throughout the appeals process we have heard verbal arguments from various members of your staff that dismiss the idea of increasing subsidies to unusually high levels, such as $750 per unit per month, for example. It is possible to reduce the subsidy amounts though, when occupancy increases and the project is better able to pay its operating expenses, something my client is perfectly willing to do after the amounts due the Sponsor have been repaid. We would also like to remind you that significantly increasing the rental subsidies will not jeopardize the budget authority for this project. In fact, the proposed 2005 expenses are even less than the amount noted in the original contract authority.

We are asking that your revise the rent increase offered by your agency to account for the budgeted vacancies in order that the project can cover the approved project expenses. We believe this should be allowed because the terms of the contract should override the guidance contained in the handbook which according to its transmittal pages "*is not all inclusive and should be used in conjunction with a number of other HUD issuances*". Additionally, the legal doctrine of merger means that the contract incorporates and supersides any prior contradictory agreement.

Again, it is our belief that the PRAC contract specifically provides for the submission of vacancies in determining the budget increase. This is a Contract which is very specific in nature regarding these expenses and which was entered into between the parties. It is our hope that through this appeal the matter may be resolved and may avoid determination through the court systems.

Once again, I am writing because the previous attempts to arrive at answers to Mr. Cantrell's questions about the contract terms have not been adequately addressed. This issue is extremely important not only for North Hills Terrace, Inc., but virtually all 202 projects that experience vacancies. The regulatory environment for these Projects is significant and we welcome any further interpretation or clarification you can offer.

We sincerely appreciate your thoughtful consideration of this request.

Sincerely

John Bell

**JOHN H. BELL**
ATTORNEY AT LAW

505 SOUTH ELM STREET, SUITE B
P.O. Box 200
SEARCY, ARKANSAS 72145-0200

BUSINESS: (501) 268-3055 EMAIL: johnhbel@swbell.net FACSIMILE: (501) 268-3458

October 31, 2005

Mr. E. Ross Burton
Director
Fort Worth Multifamily Hub
810 Cherry Street, Room 2741
Fort Worth, Texas 76102

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
RESTRICTED DELIVERY

Re: PRAC Contract No.: AR37S001005
HUD Project No.: 082EE118

Dear Mr. Burton:

You have failed and refused to respond to my earlier letter written to you on June 3, 2005, a copy of which is enclosed, and have thus put my client in the untenable situation of having to initiate a lawsuit to determine its legal standing in this matter.

If we have not heard from your office within ten days from your receipt of this letter, we will initiate court action to protect our rights under contract. Please also understand our repeated position that your failure to respond to our inquiries and appeals in this matter serves as a waiver of the requirement in the Regulatory Agreement requiring permission to initiate a suit.

I look forward to hearing from you.

Sincerely,

John Bell

JB/jr
Enclosure:

U.S. Department of Housing and Urban Development
Fort Worth Regional Office, Region VI
Fort Worth Multifamily Program Center
P. O. Box 2905, 801 Cherry Street (76102)
Fort Worth, Texas 76113-2905

November 8, 2005

Mr. John H. Bell
Attorney at Law
505 South Elm Street, Suite B
P.O. Box 200
Searcy, AR 72145-0200

Dear Mr. Bell:

SUBJECT: Project Number 082-EE118
North Hills Terrace
Hardy, Arkansas

First off, let me apologize for the lack of a response to your letters of June 3, 2005. I was under the impression that a response had been prepared and sent to you. I am in Little Rock today and was searching for a response and found that a draft had been prepared, but a final had not been sent to you and again for that I must apologize. This also responds to your October 31, 2005. This response is the final level of appeal for the rent increase decision for North Hills Terrace's January 1, 2005, rents. Please note the following schedule of events that have occurred with this particular rent increase request:

| | |
|---|---|
| 9/21/04 | Original Rent Increase Submitted to HUD for consideration |
| 11/29/04 | Rent Increase Approval Letter from HUD |
| 12/3/04 | Initial Appeal Letter to HUD – Addressed to the Field Office Director instead of the Director of Multifamily Housing |
| 1/1/05 | Rent Increase Effective Date |
| 6/3/2005 | Final Appeal Letter to HUD – Addressed to the Fort Worth Multifamily Hub Director |

North Hills Terrace is a 16 unit Section 202 Capital Advance property with rental assistance provided by the Project Rental Assistance Contract (PRAC) for all units located in Hardy, Arkansas. This property received permission to occupy on June 9, 2003, but has never reached sustaining occupancy. The current occupancy rate is 88% (or 14 units), which is the highest ever achieved.

Your specific appeal question is about HUD guidelines and processing related to vacancies that can be budgeted in a PRAC property under a rent increase review. Because of the far-reaching impact of your question, it must be thoroughly researched and analyzed through our Headquarters Housing and Legal Divisions.

Your final appeal of the January 1, 2005 rent increase is hereby denied based upon the fact that the final appeal request was received approximately six months after the decision letter on the initial appeal, which is not in accordance with the Handbook 4350.1, REV-1. Chapter 7, Paragraph 7-56, A, states: *The final appeal must be in writing and postmarked within 30 days of the date of the initial appeal decision letter.* This decision results in the rents approved for January 1, 2005, being the HUD approved rents for this property until such time as a new rent increase request is submitted and approved by HUD.

We fully intend to pursue your request for clarification of the vacancy issue with our Headquarters policy division. You should also note that the field staff are instructed and must use the HUD Handbooks in monitoring and processing requests from owners and agents. It is apparent that this property has an unusual situation with regards to leasing the units. We recommend that you direct your client to pursue the remedies that currently exist to attempt to relieve the financial strain for this property, such as: submit vacancy claims in accordance with Handbook 4350.3; submit a request for a waiver of the income and/or age requirements for this property in accordance with Handbook 4350.3. We are concerned that these measures will not fully cover the income that is currently not being collected due to vacancies, and challenge your client to continue to seek out the population that this property was built to serve.

Again, your request for clarification of the policy on allowable vacancy amounts in the budget for Section 202 Capital Advance Properties with a PRAC is being forwarded to our Headquarters policy division for interpretation. We will notify your client of their decision upon receipt. In the meantime we will continue to monitor in accordance with outstanding Handbook instructions.

If you have any questions, please contact Vin Speck, Chief, Asset Management, Little Rock Multifamily Program Center at (501) 324-6148 extension 3430.

Sincerely,

E. Ross Burton
Director
Fort Worth Multifamily Hub

September 1, 2006

Mr. Vin Speck
U.S. Department of Housing and Urban Development
425 West Capitol Avenue, Suite 900
Little Rock, AR 72201-3488

RE: Permission for court action

Dear Mr. Speck:

In accordance with the Regulatory Agreements of various Project Rental Assistance Contracts (PRACS) we are requesting your approval to ask the courts to help resolve our disagreement with the U.S. Department of Housing & Urban Development's position regarding vacancies in budget based rent increase requests. Because the arguments defending HUD's position on some of these points have not fully explained the contractual issues questioned in late 2004 and during 2005, we feel that the best way to bring them to a successful and thoughtful conclusion would be to let the courts hear both of our positions and make a determination based on the facts presented. We plan to present the following issues, some of which have been previously presented to both your offices in Little Rock and Mr. E. Ross Burton of the Ft. Worth regional office.

1. HUD's disallowing vacancies to be considered when presenting a budget based rental increase, which we believe is clearly allowed, perhaps even mandated, under the terms of the PRAC;

2. HUD's position that the language in Handbook 4350.1, REV 1, Chapter 7-30M is applicable to PRAC properties, but we believe is in contradiction to the contract itself; and

3. Recovery of sums owed to management agents, sponsors, or others who have paid operating expenses of the projects because HUD subsidies were insufficient to cover the expenses the tenant rents did not cover, because of HUD's position on the previous two points.

4. Recovery of reasonable attorney's fees and expenses.

The request is intended to apply to each of our 11 PRAC properties under management, which are shown on the attached list. We have been given permission by other sponsors to include in this request for permission, other 202 properties as well, which are included as attachments. We, along with Mr. Burton, realize the decision could affect hundreds or even thousands of 202 properties, and therefore may consider asking for class action status for this case.

We realize that Mr. Burton indicated that he would forward the vacancy issue to Headquarters Housing and Legal Divisions for their guidance, and if they have concluded in our favor then it should not be necessary to continue any action. However, we have yet to hear from Mr. Burton on his efforts to get an opinion from Headquarters, leaving us little choice in finding the answers to the issues confronting our clients.

Naturally we would appreciate the opportunity to present these matters independently in order that it can be fully answered to our satisfaction.

Thank you for your consideration.

Sincerely,

Ron Cantrell
Assistant Director/Finance Director
Enclosures

cc E. Ross Burton, Director
U.S. Dept. of Housing & Urban Development
P.O. Box 2905
Dallas, TX 76113-2905

October 12, 2006

Mr. Vin Speck
U.S. Department of Housing and Urban Development
425 West Capitol Avenue, Suite 900
Little Rock, AR 72201-3488

RE: Vacancies in Budgets for 202 PRAC properties

Dear Mr. Speck:

Throughout the budget appeals process for North Hills Terrace, Inc. (082-EE118) during 2004 and 2005, my client and I made several arguments about the vacancies being allowable in consideration of budgeted rent increases. We believe HUD erred in its responses during the appeals process, because we believe that HUD has a flawed understanding of the PRAC and its relationship to Handbook 4350.1 REV-1.

Mr. E. Ross Burton, in a letter dated November 8, 2005, recognized the importance of this issue and suggested that it must be researched and analyzed through HUD's Headquarters Housing and Legal Divisions, and further stated that HUD fully intends to pursue the request for clarification of the vacancy issue with the Headquarters Policy Division.

Unfortunately, to date we have not heard the results of any efforts to answer these questions first presented in 2004. Please understand that the occupancy level of this property (or any other PRAC 202 property) is really not an issue, nor is the availability of special vacancy claims as suggested by your staff in an earlier appeal response.

With no clear answer to the discrepancy between the Handbook and the PRAC, and with dozens of properties and their sponsors and management agents at risk for substantial losses, we feel that we have no choice but to ask the courts to intervene for an answer on behalf of this property, and possibly many others throughout Arkansas and nationally.

I am confident that you and your staff would be genuinely interested in exploring the issues further and finally getting to the bottom of this as quickly as possible. Therefore, I have drafted a complaint against HUD on behalf of my client(s) to be filed next month. The complaint will ask for a declaratory judgment as to the interpretation of the contract, monetary compensation, instructions to HUD staff regarding vacancies budgeted, to void certain language in Handbook 4350.1 REV-1, and a change in the way HUD responds to operating shortfalls for these properties. This complaint will be filed unless we can hear an appropriate response to the vacancy issue by September 30th. Even so, if such a response is inadequate or otherwise fails to satisfy our client(s) then we plan to proceed to the courts for resolution. We must consider a failure to adequately address these issues in a timely manner as your approval for us to pursue these actions in court, in accordance with the Regulatory Agreement.

Sincerely,

John Bell

CC E. Ross Burton