Doc# 200205520
Book 20[illegible] Page 19126

Capital Advance Program
**Regulatory Agreement**
Housing for the Elderly or Handicapped (Nonprofit)
Section 202 of the Housing Act of 1959 or Section 811 of the National Affordable Housing Act.

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

This agreement entered into 21st day of October XX 2002, between North Hills Terrace, Inc whose address is PO Box 2637 Batesville, AR 72503 hereinafter called Mortgagor, and the undersigned Secretary of Housing and Urban development hereinafter called HUD.

In consideration of the making of the capital advance by HUD and the disbursement of any part thereof, and in order to comply with the requirements of the Housing Act of 1959 or National Affordable Housing Act of 1990 and the Regulations adopted by the Secretary pursuant thereto, the Mortgagor agrees for itself, its successors and assigns, and any owner of the mortgaged property, that in connection with the mortgaged property and the project operated thereon and so long as the capital advance is outstanding:

1. The Note and Mortgage bear no interest and repayment is not required so long as the housing remains available for very low-income elderly persons or very low-income persons with disabilities (whichever is applicable).

2. Mortgagor will establish and maintain a special fund to be known as the revenue fund account in a bank which is a member of the Federal Deposit Insurance Corporation, Savings Association Insurance Fund, or the National Credit Union Share Insurance Fund, into which will be deposited all rentals, charges, income and revenue arising from the operation or ownership of the project. The bank in which this account is established shall provide collateral acceptable to HUD to equal the maximum amount in the account at any one time when such amount exceeds $100,000. If the bank will not provide appropriate collateral in such instances, the Mortgagor will be required to establish accounts in two or more banks so that the total amount on deposit at any time does not exceed $100,000 in any one bank. Expenditures shall be made from the revenue fund account only in accordance with the operating budget submitted to and approved by HUD.

3. Not later than 30 days prior to the beginning of each fiscal year, the Mortgagor shall submit an operating budget for that fiscal year to HUD. The budget shall include all necessary operating expenses, current maintenance charges, expenses of reasonable upkeep and repairs, taxes and special assessment levies, prorated amounts required for insurance and all other expenses incident to the operation of the project; and shall show the expected revenue to pay such expenses, including reserve fund deposits. The expenses incurred and disbursements shall not exceed the reasonable and necessary amount thereof, and the Mortgagor will not expend any amount or incur any obligations in excess of the amounts approved in the annual operating budget except upon written certification by the Mortgagor to HUD that such expenses were unanticipated and are necessary and provided further, that nothing in this section shall limit the amount which the Mortgagor may expend from funds obtained from some other source than project revenues or other funds required of the Mortgagor pursuant to this Agreement or the Capital Advance Agreement.

4. As security for the Capital Advance for the required payments under this Agreement into the reserve fund for replacements, and for all other obligations of the Mortgagor under this Agreement, the Mortgagor hereby assigns, pledges and mortgages to HUD all its rights to the income and charges of whatever sort which it may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents or project income in the Mortgage referred to herein. Until a default occurs under this Agreement, however, permission is granted to Mortgagor to collect and retain under the provisions of this Agreement such rents, income, operating surplus and charges, but upon default this permission is terminated, as to all rents, income, operating surplus and charges due or collected thereafter.

5. (a) Mortgagor will establish and maintain a reserve fund for replacements in a separate account in a bank which is insured by the Federal Deposit Insurance Corporation, Savings Association Insurance Fund, or the National Credit Union Share Insurance Fund. Concurrently with the effective commencement of rental assistance payments under the Project Rental Assistance Contract, the Mortgagor will deposit an amount equal to $168.42 per month unless a different date or amount is approved in writing by HUD.

   Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be subject to the control of HUD. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project for any other purpose, may be made only after the consent in writing of HUD. In the event of a default in the terms of the mortgage, HUD may demand the full or partial application of the balance in such fund to be amount due on the mortgage debt.

   (b) Mortgagor will deposit the minimum capital investment with an escrow agent acceptable to HUD pursuant to Regulations.

   (c) Within 60 days after the end of each fiscal year, any residual receipts realized from the operation of the mortgaged property shall be deposited in a separate



EXHIBIT
C

residual receipts account. Residual receipts shall be under the control of HUD and shall be disbursed only at the discretion of HUD for such purpose as it may determine to be necessary or appropriate.

6. The real property covered by the Mortgage and this Agreement is described in Schedule A attached hereto.

7. Mortgagor shall not without the written approval of the Secretary;

(a) Transfer, dispose of or encumber any of the mortgaged property. Any such transfer shall be only to a person or persons or corporation satisfactory to and approved by HUD, who shall, by legal and valid instrument in writing, to be recorded or filed in the same recording office in which conveyances of the property covered by the Mortgage are required to be filed or recorded, duly assume all obligations under this Agreement and under the Note and Mortgage;

(b) Assign, transfer, dispose of, or encumber any personal property, including rents or charges, and shall not disburse or pay out any funds except as provided herein and in the Capital Advance Agreement.

(c) Remodel, reconstruct, add to, or demolish any part of the mortgaged property or subtract from any real or personal property of the project;

(d) Pay any compensation or make any distribution of income or other assets to any of its officers, directors or stockholders;

(e) Enter into any contract or contracts for supervisory or managerial services;

(f) Require as a condition of occupancy or leasing of any unit or residential space in the project, any consideration or deposit other than a security deposit in an amount equal to one month's total tenant payment or $50, whichever is greater. The family is expected to pay the security deposit from its own resources and other available public or private resources. The Mortgagor may collect the security deposit on an installment basis.

The security deposits must be placed in a segregated interest-bearing account. A record shall be maintained of the amount in this account that is attributable to each family in residence in the project. Annually for all families, and when computing the amount available for disbursement, the Mortgagor shall allocate to the family's balance, the interest accrued on the balance during the year. Unless prohibited by State or local law, theMortgagor may deduct for the family, from the accrued interest for the year, the administrative cost of computing the allocation to the family's balance. The amount of the administrative cost adjustment shall not exceed the accrued interest allocated to the family's balance for the year. The amount of the segregated, interest-bearing account maintained by the Mortgagor must at all times equal the total amount collected from the families then in occupancy plus any accrued interest and less allowable administrative cost adjustments. The Mortgagor must comply with any applicable State and local laws concerning interest payments on security deposits.

The Mortgagor, subject to State and local law, may use the family's security deposit balance as reimbursement for any unpaid family contribution or other amount which the family owes under the lease in accordance with the Regulations.

(g) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by HUD.

(h) Amend its articles of incorporation or by-laws other than as permited under the terms of the articles of incorporation approved by HUD.

8. Mortgagor shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good and substantial repair and condition; provided that, in the event all or any of the buildings covered by the Mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the Mortgage.

9. Mortgagor shall not file any petition in bankruptcy or insolvency, or for a receiver, or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors; or permit an adjudication in bankruptcy, or insolvency, the taking possession of the mortgaged property or any part thereof by a receiver, or the seizure and sale of the mortgaged property or any part thereof under judicial process or purusant to any power of sale and fail to have such adverse actions set aside within 45 days.

10. Mortgagor shall from funds other than project income immediately satisfy or release any mechanic's lien, or any other lien which attaches to the mortgaged property or any personal prop-erty used in the operation of the project, and shall dismiss or have dismissed or vacated any receivership, or petition in bank-ruptcy or assignment for benefit of creditors, creditors bill or insolvency proceeding involving the project or the mortgaged property.

11. (a) If the Mortgagor has or comes to have any nonproject funds, all income and other funds of the mortgaged project shall be segregated from any such funds of the Mortgagor and segregated from any funds of any other corporations or persons. Income and other funds pledged to the mortgaged project shall be expended only for the purposes of the project.

(b) Mortgagor shall provide for the management of the project satisfactory to HUD. Any management contract entered into by the Mortgagor involving the project shall contain a provision that it shall be subject to termination, without penalty and with or without cause, upon written request by HUD addressed to the Mortgagor and the management agent. Upon receipt of such request the Mortgagor shall immediately move to terminate

the contract within a period of not more than 60 days and shall make arrangements satisfactory to HUD for continuing proper management of the project.

(c) Neither Mortgagor nor its agents shall make any payments for services, supplies or materials unless such services are actually rendered for the project or such supplies or materials are delivered to the project and are reasonably necessary for its operation. Payments for such services or materials shall not exceed the amount ordinarily paid for such services, supplies or materials in the area where the services are rendered or the supplies or materials furnished.

(d) The mortgaged property, equipment, buildings, plans, offices, devices, books, apparatus, contracts, records, documents, and all other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by HUD and its duly authorized agents. Mortgagor and its successors, assigns or its agents shall retain copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by HUD or its duly authorized agents.

(e) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of HUD.

(f) Within 60 days following the end of each fiscal year HUD shall be furnished with a complete annual financial report based upon an examination of the books and records of Mortgagor prepared in accordance with the requirements of HUD, certified to be an officer of the Mortgagor and, when required by HUD, prepared and certified by a Certified Public Accountant, or other person accepted to HUD.

(g) At the request of HUD, its agents, employees, or attorneys, the Mortgagor shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contracts, operation, and condition of the property and the status of the Mortgage and any other information with respect to the Mortgagor or the mortgaged property and of the project which may be requested.

(h) All receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the FDIC, Savings Association Insurance Fund, or the National Credit Union Share Insurance Fund. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project. Any person receiving funds of the project shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any person receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust.

(i) Mortgagor shall at all times, if required by the laws of the jurisdiction, maintain in full force and effect a license to operate the project from the State and/or other licening authority. Mortgagor shall lease any portion of the project only on terms approved by HUD.

(j) Mortgagor shall not collect from tenants or occupants or prospective tenants or occupants of the project any admission fee, founder's fee, life-care fee, or similar payment pursuant to any agreement, oral or written, whereby the Mortgagor agrees to furnish accommodations or services in the project to persons making such payments.

(k) No officer, director, trustee, member, stockholder nor authorized representative of the Mortgagor except for management by sponsor or non-profit affiliate, shall have any financial interest in any contractual arrangement entered into by the Mortgagor in connection with rendition of services, the provision of goods or supplies, management of the project, procurement of the site or other matters whatsoever.

12. (a) If project is funded under Section 202 of the Housing Act of 1959, as amended, Mortgagor will limit public occupancy of the project to elderly families and individuals as defined in Section 202 of the Housing Act of 1959, and applicable HUD Regulations. If project is funded under Section 811 of the National Affordable Housing Act of 1990, Mortgagor will limit public occupancy of the project to persons with disabilities as defined in Section 811 of the National Affordable Housing Act of 1990, and applicable HUD Regulations. The criteria governing eligibility of tenants for admission to Section 202 or Section 811 units and the conditions of continued occupancy shall be in accordance with the Project Rental Assistance Contract.

(b) Except as provided in (d) below Mortgagor will make its dwelling accommodations and services available to eligible occupants at charges established in accordance with a schedule to be approved in writing by HUD. Such accommodations shall not be rented for a period less than 30 days. Commercial facilities, if any, shall be rented only in accordance with a schedule of charges fixed by the Mortgagor and approved in writing by HUD. Subleasing of dwelling accommodations or commercial facilities shall be permitted only upon the terms and conditions approved by HUD in writing.

(c) Upon prior written approval by the Secretary, Mortgagor may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Mortgagor for any facilities and/or services which may be furnished by the Mortgagor or others to such tenant upon request, in addition to the facilities and services included in the approved Project Rental Assistance Contract.

(d) Nothing contained in this Agreement shall be construed to relieve the Mortgagor of any obligations under the Project Rental Assistance Contract.

(ii) All obligations of the project other than the mortgage held by HUD unless funds for payment are set aside or deferment of payment has been approved by HUD; and

(2) The segregation of;

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held.

(h) "Assisted Units" refer to units assisted pursuant to Project Rental Assistance Contract.

(i) "Assistance Contract" refers to a Project Rental Assistance Contract between the Mortgagor and HUD under Section 202 of the Housing Act of 1959 or between the Mortgagor and HUD under Section 811(d)(2) of the National Affordable Housing Act of 1990.

18. HUD shall not be liable for any of its actions hereunder except for arbitrary and capricious conduct.

19. This instrument shall bind, and the benefits shall inure to, the respective parties hereto, their legal representatives, executors, administrators, successors in office or interest, and assigns, and all owners of the mortgaged property, so long as the Mortgage is outstanding.

20. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

21. Mortgagor warrants that it has not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereto, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

22. Mortgagor does not assume personal liability for payments due under the Note and mortgage or for payments to the reserve for replacement fund. However, defaults or other failures to follow program requirements may result in limited denial of participation or debarment from HUD or other Federal programs.

23. Mortgagor shall have available necessary equipment or devices and make reasonable accommodations to meet the needs of persons with visual and/or hearing impairments in compliance with Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and 24 CFR Part 8.

| United States of America<br>Secretary of Housing and Urban Development (Signature) | | Owner(Signature)<br>[signature] | |
|---|---|---|---|
| By (Name)<br>[signature] | | By (Name)<br>James Carr North Hills Terrace, Inc | |
| Official Title<br>Director<br>Multi-family Housing | Date<br>10/18/02 | Official Title<br>President | Date<br>7th October 2002 |



form HUD-92466-CA (4/92)
ref. Handbook 4571.4 & 4571.5

STATE OF ARKANSAS}
} SS
COUNTY OF PULASKI }

ACKNOWLEDGMENT

BE IT REMEMBERED, That on this 7th day of October, 2002 before me the undersigned, a Notary Public, within and for the County aforesaid, duly commissioned, qualified and appeared James Carr to me personally well known, to be the President of North Hills Terrace, Inc., and is duly authorized to execute the foregoing instrument for and in the name and behalf of the said corporation, and further stated and acknowledged that they had so signed, executed and delivered said foregoing instrument for consideration and purposes therein expressed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal as such Notary Public, on this 7th day of October 2002.

Tabitha Hopper
Notary Public

TABITHA M. HOPPER MY COMM. EXP. NOTARY PUBLIC JAN. 13, 2007 PULASKI CO., ARKANSAS

My Commission Expires: 1-13-2007

---

STATE OF ARKANSAS}
} ss
COUNTY OF PULASKI}

ACKNOWLEDGMENT

BE IT REMEMBERED, That on this 18th day of October, 2002 before me the undersigned, a Notary Public, within and for the County aforesaid, duly commissioned, qualified and appeared Linda Hardway to me personally well known, to be the appointed Authorized Agent and the person who executed the aforesaid instrument bearing the date of 18th of October 2002 by virtue of the Authority vested in him by 24 C.F.R. 200, 118, acknowledged that she executed the foregoing instrument for and on behalf of the Federal Housing Commissioner, for the considerations and purposes therein expressed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal as such Notary Public, on this 18th day of October 2002.

Tabitha Hopper
Notary Public

My Commission Expires:
January 13, 2007
(Seal)

TABITHA M. HOPPER MY COMM. EXP. NOTARY PUBLIC JAN. 13, 2007 PULASKI CO., ARKANSAS

# LEGAL DESCRIPTION

A tract of land being all of Lot 1 and a part of Lot 2, Block 6, Clayton & Cope Addition to the City of Hardy, Sharp County, Arkansas and a part of the NE ¼ Section 11, T19, N, R 5 W more particularly described as follows:

Commencing at the Northwest corner of said NE ¼, Section 11, thence South 15° 21′26″ East, 469.18 feet to the southerly right-of-way line of Clayton Street, the Northwest corner of said Lot 2 and the point of beginning:

Thence along the right-of-way line, South 61° 38′26″ East, 235.00 feet to the northeast corner of said Lot 1 and the West right-of-way line of Johnson Street; thence along said West right-of-way line south 03° 21′34″ West, 150 feet; thence North 84° 09′20″ West, 188.63 feet; thence North 00° 34′01″ East, 55.32 feet; thence North 88° 14′54″ West, 23.25 feet; thence North 03° 47′34″ East, 186.54 feet to the point of beginning. This tract contains 0.93 acres more or less, subject to any and all easements.

CERTIFICATE OF RECORD
Doc# 200206520
Book: 2002
Pg: 19126 - 19132
Filed & Recorded
10/21/2002
08:11:37 AM
Official Records of
TOMMY ESTES
CIRCUIT COURT & COUNTY CLERK
SHARP COUNTY COURTHOUSE

By S. McCullough, DC

U.S. Department of Housing and Urban Development
HOUSING

Special Attention of:
Regional Administrators, Regional Housing Commissioners, Directors of Regional Housing, Managers Category A and B Offices, Directors of Housing Management Divisions, Loan Management Branch Chiefs, Assisted Housing Management Branch Chiefs, Owners, Management Agents, and Subsidy Contract Administrators of Projects covered by this Handbook.

# Transmittal

Handbook No.: 4350.1 REV-1

Issued: 9/22/92

1. This Transmits

Handbook 4350.1 REV-1, Multifamily Asset Management and Project Servicing

2. **Explanation of the Materials Transmitted:**

A. This handbook replaces and renames the former version of Handbook 4350.1, formerly entitled, Insured Project Servicing Handbook, dated 9/70. The current handbook has been expanded to take into account changing concepts in the housing industry that have developed in the more than twenty years that have elapsed since its first issuance, particularly in concepts drawn from the fields of real estate asset management, mortgage servicing/loan administration, and subsidy contract administration.

B. HUD staff should regard asset management as the art of combining the management of the physical property with the management of its financial aspects to achieve the goals of HUD, owners, managing agents, and lenders.

C. This handbook is the primary handbook used by Field Office Loan Management staff in fulfilling their asset management and loan servicing (loan administration) responsibilities in assisting managing agents and owners to maintain multifamily projects in good physical and sound financial condition. However, this handbook is not all-inclusive and should be used in conjunction with a number of other HUD issuances.

D. The former handbook has been reorganized to reflect the many changes in the housing industry. Some chapters of the current handbook may apply differently to different types of multifamily projects, such as co-insured projects, HUD-Held projects, projects for the elderly, etc., so the "Applicability" paragraphs of these chapters should be read closely.

EXHIBIT
tabbles
D

HMHP : Distribution: W-3-1, W-2(H),W-3-(A)(OGC)(ZAS),W-4(H),R-1,R-2,R-3,R-3-1,R-3-2,R-3-3, R-6,R-6-1,R-6-2,R-7,R-7-1,R-7-2,R-8,Special Distribution to

E. Six new chapters were issued as separate "Changes" to the former handbook 4350.1. These chapters were not printed and distributed as "Changes" but instead are incorporated in the printing of the current handbook. These chapters should be read carefully by all users of this handbook since they add many important changes:

1. Chapter 1, "Introduction," which describes the reorganization of the current handbook, discusses asset management, and lists other frequently used HUD handbooks.

2. Chapter 15, "Refunding of Certain Tax-exempt Bonds Issued to Finance Multifamily Housing Projects," which provides instructions for approving refunding of tax-exempt bonds at lower interest rates for mortgages that are in default or threatening default.

3. Chapter 16, "Partial Release of Security; Alterations, Modifications, or Additions to Physical Structures," which clarifies certain delegations of authority, discusses certain tenant notification procedures, and revises former handbook instructions on the topic.

4. Chapter 28, "Special Escrows," which describes uses of escrows for special purposes, specific information on Housing Management's role in administering Operating Deficit Escrows, and uses of Letters of Credit as a means of funding escrows.

5. Chapter 29, "Conversion to Cooperative Ownership," which establishes procedures for a specific type of cooperative conversion that falls under Housing/Loan Management's programmatic authority.

6. Chapter 34, "Calculating Rents Utilizing the Annual Adjustment Factor," which discusses processing steps Loan Management staff should take when calculating a Special Rent Increase for AAF calculated rents. It also addresses particular considerations for calculating special rent increases for previously HUD-owned Property Disposition projects sold on an "All Cash" basis.

market rent or something between basic and market rents which represents 30 percent of adjusted income.

B. Maximum Allowable Rent Potential. The maximum annual rent the owner may collect by charging the rents authorized by HUD on the Form 92458.

C. Utility Allowance. (APPLIES ONLY FOR PROJECTS RECEIVING SUBSIDY ASSISTANCE WHERE ALL OR SOME UTILITIES ARE PAID DIRECTLY BY THE TENANT.) An estimate of utility costs (except telephone) for an average family occupying a unit.

Clarification: Section 221(d)(3) BMIR projects that were built with tenant paid utilities (separate meters) do not need utility allowances. If the project has Rent Supplement or LMSA units, those units however, receive an allowance.

D. Section 8 Contract Rents. The rent level called for under the subsidy contract and adjusted annually. Rent used for units subsidized under Section 8 (LMSA) where the owner has had his rent decontrolled or used the alternative rent mechanism.

E. Services. This refers to such benefits as may be provided by the project owner to tenants that are not included in the rent and are optional on the tenant's part (i.e., cable T.V., laundry facilities and use of community space in the project.)

## SECTION 2. TENANT COMMENT PROCEDURES FOR A RENT INCREASE

7-5. GENERAL. Tenant comment procedures for the rent increase process are provided for in Section 202(b)(1) of the 1987 Housing and Community Development Amendments (HCDA) and Section 329(F) of the 1981 HCDA. Regulations at 24 CFR 245 set the Department's policy on the subject (See Appendix 1). These requirements for tenant comment on rent increases and utility allowance reductions apply to all projects listed in Section 1, Paragraph 7-2 except those rentals under Section 207, 213, 234, Section 231, 220 and Section 221(d)(4) and 202s assisted under Part 885. They also

IMPORTANT: Owners must keep the posted Notices in place and in legible form for the tenant comment period.

7-8. <u>TENANT REVIEW AND COMMENT.</u> During the 30 days following the date the Notice to Tenants was given, the owner must make all of the materials listed in Section 4, paragraph 7-22 plus any additional information used to justify the increase available to tenants or their representatives to review and/or copy. For the purpose of computing tenant comment periods, owners must consider the date the Notice was given to be the date by which all Notices had been hand carried or mailed and all required copies had been initially posted. The materials must be available at least during normal business hours.

7-9. <u>COMMENT SUBMISSION.</u> Tenants may submit written comments on the increase request to the owner or to the HUD Field Office or both. In cases where comments are submitted to the owner, all such comments must be reviewed and evaluated. The comments and evaluations should then be forwarded to the HUD Field Office as part of the formal rent increase request.

7-10. <u>CHANGES TO SUPPORTING DOCUMENTATION.</u> If during the 30 day comment period the owner makes a material change in any of the documents submitted in support of the increase, the owner must notify the tenants of the change(s) in a notice to be distributed in the <u>exact</u> same manner as the original Notice to Tenants. The owner must make the revised materials available for the tenants to review and/or copy for the LONGER of 15 days after the revised notice was given or the days remaining in the initial 30-day comment period.

7-11. <u>SUBMITTING THE FORMAL REQUEST FOR AN INCREASE.</u> At the conclusion of the tenant comment period as defined in either paragraph 7-8 or paragraph 7-10 above the owner must forward in addition to the tenant comments and evaluations, an executed copy of the owner's Certification as to Compliance with 24 CFR Part 245's Review and Comment Procedures. (See Appendix 2)

Section 8 LMSA assistance the option to request the Alternative Rent Mechanism, provided they agree to amend the Regulatory agreement, and have the Section 8 rents determined by the applicable annual adjustment factor.

7-16. 1987 HOUSING ACT. The Housing Act of 1987 imposed restrictions on the decontrol of rent and use of the alternative rent mechanism which affected owners who had not requested changes in their regulatory agreements. For those owners whose request for a regulatory change was received before 12/1/87, HUD will process the request and sign the new agreement. However, for owners of projects who were eligible under the 1983/86 regulations BUT who did not request the necessary amendment prior to 12/1/87, the Act requires that the project meet the following tests before the amendment can be approved: (1) The project may not have a project based Section 8 contract; and (2) no more than 50 percent of its tenants can be defined as lower income.

7-17. PROJECTS NOT COVERED BY THE 1987 ACT. Projects endorsed and insured (or co-insured) on or after 11/30/83 under Section 207 and 223 are NOT covered by the 1987 Housing Act. This is notwithstanding any language presently contained in the regulatory agreement.

7-18. PROJECTS COVERED BY THE 1987 ACT. The Field Office will apply the tests required in the 1987 Act to:

(A) Unsubsidized Section 207, 213(rental), 223(f), 231(c)(4), and 234 (rental) projects that could have elected the Alternative Rent Mechanism under the April 19, 1983 rule, but did not do so before 12/1/87.

(B) Unsubsidized 220 and 221(d)(4) projects insured prior to 6/1/83 who could have elected to deregulate charges for rents, facilities, or services under April 19, 1983 rule, but did not do so before 12/1/87.

(C) Section 207, 213(rental), 223(f), 231(c)(4), and 234 (rental), 220 and 221(d)(4) projects insured prior to 11/30/83 and assisted by Section 8 LMSA

1) Summarizes the reasons why a rent increase is needed and the date the increase will be effective. Describe the project's physical condition and any improvements that have been budgeted for. The letter may refer to the reasons stated in the Notice or elaborate on those reasons. (The main reasons stated in the letter must be the same as the main reasons stated in the Notice to Tenants, if the project was subject to the tenant comment procedures in Section 2.)

2) Identifies any proposed change in services, equipment or charges and the reasons for the change.

B. ~~A Budget Worksheet~~ (Appendix 4(d) format) providing income and expenses for the 12 months following the anticipated effective date of the proposed rent increase.

C. A brief statement explaining the basis for any increase in the expense line items on the budget work sheet. Generally, if an increase amounts to <u>5 percent or more</u>, it must be documented. If the income or expense was estimated at the prior annual period's actual, or the increase is less than $500, no explanation is required. (Appendix 4(b) provides a sample owner explanation of budget items.)

D. Where applicable, a copy of the Notice to Tenants annotated to show where and how the Notice was distributed (e.g., posted, mailed, hand carried).

E. An executed copy of the Owner's Certification Regarding Purchasing Practices and Reasonableness of Expenses (Appendix 3).

F. A status report on the project's implementation of its current Energy Conservation Plan (See Chapter 12). This may be: (1) a narrative report coded to facilitate references to the plan; or (2) copy of the plan annotated to show the current status of

B. <u>Processing Procedures for Budgeted Rent Determination.</u>

1) Section 207, 231, 213, 220, 221(d)(4) owners or owners of projects which are required to have their rents approved by HUD, who do not choose to use the Alternative rent Determination procedures will continue to have their rents determined as prescribed in this chapter and no Regulatory Agreement amendment is necessary.

2) Section 207 owners or owners of projects who require HUD approval of rents or owners of projects who otherwise could chose not to have HUD control rents, that wish to use the Alternative Rent Determination Procedures provided for, shall have their rent determined by HUD based on the submission required in paragraph 7-23(A) of this section. HUD will approve the lower of the following two rent potentials: (1) apply the original debt service factor to the current market appraisal covering the residential value of the property. Then process the rents as outlined in this chapter, to determine Gross Potential Rent; or (2) the comparable rents submitted as part of the appraisal.

NOTE: The independent organization or person hired by the owner to conduct and provide the certified appraisal must be a recognized professional appraiser. The appraiser in making his/her rental analysis must determine the residential rental income separate from the commercial income and provide a delineation in the value of the residential portion separate from the commercial portion of the value. The Field Office in determining the Gross Potential Rents using the new appraisal will use the residential rent portion of the certified appraisal to apply the original debt service factor set at the time of final endorsement in determining the new debt service allowed in the rent computation and insert the new appraised residential value in Box H of the Rent

process until such time as the comparable rents are less than budgeted rents. When this happens, the comparable rents shall be approved as the Rent Level.

3) As long as the owner submits a comparable Rent Level which is less or equal to the rent level that would be provided using the last appraised value in determining rents as described in paragraph 7-23(B)(2) of this Section, a new appraisal is not required. However, when the comparable rents exceed the rents allowed using the last appraised value, then the owner must either submit a new appraisal showing that the rents based on the appraisal are more than the rents based on comparables in order to charge the comparable rents or he/she must charge the rent as determined by using the new appraisal which is less than the comparables.

E. <u>Thirty Day Processing of Alternative Rent.</u> The LMBC must (in writing) approve, disapprove or approve for a different amount requested by the owner within 30 days of receipt. Failure on the part of the LMBC to notify the owner in writing of the findings will provide temporary authority to the owner to charge the proposed rents. In the event that the owner implemented the rents at the end of 30 days without HUD's written approval, the additional rents shall be placed in an escrow account or a letter of credit shall be provided so that in the event HUD fails to approve the rent increase, or approves the increase for less than requested, the owner shall immediately return to the tenants that portion of the rent collected which HUD later disapproved. <u>This applies only to rents processed using the alternative rent mechanism.</u>

F. <u>Allowable Project Costs.</u> While the cost of the appraisal and/or market analysis can be paid for out of project income, it is not to be used as an allowable project expense in the rent determination defined in Section 5 of this chapter.

7-25. <u>FIELD MANAGEMENT OF THE RENT REQUEST PROCESS.</u> HUD Field Offices must establish a tracking system that will facilitate and monitor compliance with the following processing times:

A. <u>When the Proposed Potential does NOT exceed the Maximum Potential.</u> In these instances, the Field Office need only review the proposed utility allowances and the Rent Schedule. Field staff should complete these actions and return the signed Form 92458 within 10 working days of receiving the owner's request.

B. <u>When the Rent Increase Exceeds the Maximum Potential.</u>

1) <u>All Projects.</u> The Field Office should check the completeness of the owners' initial submission within 5 working days of its receipt. Doing so will expedite any required reposting and reduce processing delays.

2) <u>Projects NOT subject to 24 CFR 245 Tenant Comment requirements.</u> Complete these reviews and issue a decision letter within 30 days after receipt of all materials required by Section 4, paragraph 7-22.

3) <u>Projects subject to 24 CFR Tenant Comment procedures.</u> Issue decision letters within 30 days after receipt of the formal rent increase request which includes the tenant comments and other materials required by Section 2, paragraph 7-11. Final approval cannot take place before the tenant comment period has ended.

C. <u>Check the completeness of the Owner's Initial Submission.</u> Within 5 working days of receipt of the owner's initial submission, answer the following questions where applicable.

1) Does the Notice to Tenants contain all of the information included in the sample notice in Appendix 1? If it doesn't, require the owner to revise the Notice and distribute it as directed.

B. Conversely, in areas where seasonal rents are customary, there may be rental housing projects which experience financial difficulty because year-round occupancy cannot be maintained. In such circumstances, HUD will not object to the establishment of seasonal rents for a temporary period provided that:

(1) Preference at all times in all units will be given to permanent tenants at the established year-around rental rate.

(2) None of the units in the project will be rented for a period of less than 30 days.

(3) There will be no increase in existing maximum permissible gross rent by reason of seasonal rates being allowed, and as to the individual units, the aggregate gross rent collected during any fiscal year should not exceed the established maximum rent.

(4) Seasonal rents are not permitted in any project receiving a project-and/or mortgage-based subsidy.

C. If examination of the project operations supports the need for seasonal rents, the Housing Management Division (or Insuring Office) Director will grant approval in the form of a letter agreement which shall define the number and type of units so covered, and shall evidence the mortgagor's acceptance of the foregoing conditions under which approval is given. Deviations from the terms under which approval was obtained will operate to breach the agreement.

7-27. BMIR RENTS PAID BY OVER-INCOME TENANTS. HUD-91709, Schedule of Computation of Rental Income in Excess of BMIR Rent Paid by Over Income Tenants, is a monthly schedule to be completed by BMIR mortgagors in order to compute the amount of rent in excess of BMIR rent paid by over-income tenants. These funds are available for credit to the residual receipts account if the project has a surplus cash position at the end of the fiscal year. The completed form shall be used by Housing Management Division personnel and project accountants

C. Adhering to Excess Income Requirements. The Section 236 law states that the project owner shall accumulate, safeguard, and periodically pay to the Secretary all rental charges collected in excess of the basic rental charges." HUD's continued payment of interest reduction subsidy to the mortgagee is contingent on the owner's strict adherence to program requirements.

(1) The Subsidized Housing Programs Division, Office of Finance and Accounting, shall send to the mortgagor or the designated management agent a demand letter, and one follow-up letter if no answer is received within 15 days. Copies of these letters shall be sent to the appropriate Housing Management Division Director and to the Director, Office of Multifamily Housing Management.

(2) Upon receipt of a copy of the first demand letter to the mortgagor, the Housing Management Division Director shall immediately take whatever action is deemed appropriate to obtain compliance.

(3) Upon receipt of a copy of the follow-up letter to the mortgagor, the Housing Management Division Director shall intensify efforts to obtain compliance. These efforts shall include, but not necessarily be limited to, immediate notification to the mortgagor by Certified Mail, Return Receipt Requested, that it may be subject to the penalties in D. below unless and until the required Form HUD-93104 together with any amount due, are received by the Mellon Bank Lockbox within 30 days of the date of the letter. (See Appendix 12). Copies of the Notice to the owner shall be sent to the mortgagee; the Subsidized Housing Programs Division, Office of Finance and Accounting and; the Office of Multifamily Housing Management, Operations Division. The Housing Management Division Director shall continue efforts to obtain compliance during the 30-day period.

(h) Suspend interest reduction payments to the mortgagee and in the event the mortgage is insured, upon assignment to HUD, immediately recommend foreclosure;

(i) Recommend assessment of Civil Money Penalties in accordance with the provisions of Section 1735f-15 of Title 12 of the United States Code;

(j) Assess Double Damage penalties, authorized by Section 1715z-4a of Title 12 of the U.S. Code;

(k) Assess interest on the excess income due at the current Treasury borrowing rate, i.e., the cost to the Government for the money;

(l) Denial of rent increases, Transfers of Physical Assets, Plans of Action, Equity loans; and other owner-requested actions until delinquent amounts are paid in full;

(m) Request the insured mortgagee to accelerate the debt;

(n) Request Inspector General to audit the project's books and records;

(o) Collect all rents in connection with the project and use such collections to pay excess income and other obligations under the mortgage and Regulatory Agreement;

(p) Take over possession and operation of the project; and

(q) Apply to any court for injunctive relief, appointment of a receiver, or other appropriate relief.

(3) The Director, Office of Multifamily Housing Management, if applicable, shall notify the mortgagor by certified mail of the

Agreement will result in the entire rescheduled amount becoming immediately due.

(4) Repayment Agreements executed previously shall be incorporated into and made a part of the Repayment Agreement, constituting one (1) Agreement and Note.

(5) Repayment Agreements shall not:

(a) result in any inclusion of delinquent amounts as a line item or portion in the budgeted rent increase processing;

(b) result in a reduction of living standards of the tenants;

In addition, where the owner is a limited dividend owner who took a dividend or distribution during the period of delinquency, and the amount due is less than or equal to the amount improperly distributed, the owner shall be required to return the dividend or distribution in a lump sum payment in sufficient amount to repay the outstanding amount due. The owner may accrue any amount returned and repayment to partners may be made at future semi-annual or annual determinations that the project is in a surplus cash position.

F. <u>Monitoring responsibilities associated with reporting and collection of excess income.</u> The project owner is required to send original Reports, Form HUD-93104, and any Excess Income on a monthly basis to a lock box (Mellon Bank). Copies of these Reports are sent simultaneously to the field office. The lock box forwards excess income funds to the Department of Treasury. Original Reports and collections are forwarded to OFA. Based upon this information, the automated accounting system will generate the following;

(1) First and second demand letters to delinquent owners.

(2) Monthly summary reports for the Field Office which lists owners who are delinquent.

each project. The amounts due HUD are for projects which have Form HUD-93104 on file, but did not remit the funds due to HUD.

o Summary of Delinquencies (A25FICA). This report provides the number of delinquent projects and total amount of delinquencies by Field Office from October 1985 to the present month.

Loan Management is responsible for obtaining these reports, following up with owners, and monitoring and enforcing program compliance.

(a) The Director, Housing Management Division shall notify the Director, Subsidized Housing Programs Division, OFA, in writing if any problems are experienced receiving reports timely or regularly, and any other errors, e.g., posting.

(b) Section 236 Multifamily Excess Income records will receive greater emphasis by the Housing Management Division during the Management Review process, and on-site physical and occupancy inspection.

G. Refund of Excess Income. If it is determined that due to a project owner's revision of a prior reporting period(s), that a refund is due, the project owner must request the refund in writing. Refund requests are to be directed to the Office of Finance and Accounting, Subsidized Housing Programs Division, ATTN: Excess Rental Income, 451 7th Street, SW, Room 3206, Washington, D.C. 20410. Project owners are to include the revised reports when requesting a refund. Overpayments cannot be used to offset any future excess rental income."

H. Considerations in the case of incentives to owners to maintain their projects as low-and moderate-income housing. Title II of the Housing and Community Development Act of 1987, authorizes the Secretary to provide incentives to owners of "eligible low income housing" who agree to maintain their projects as low

Subsidized Housing Programs Division, Office of Finance and Accounting for their records and reporting information.

## SECTION 5. REVIEW OF PROJECT INCOME AND EXPENSES

7-29. FOCUSING THE REVIEW. Determine if the project has any special conditions that will affect income and expense estimates.

A. Assess the project's physical condition. To do so, review any:

1) Recent HUD or mortgagee on-site inspections;

2) Tenant complaints and any resolutions on maintenance;

3) Energy Conservation Plan on file for the project;

4) Recent replacement reserve analysis or withdrawals;

5) Repair schedules required by TPAs, flexible subsidy contracts, or workout arrangements. (Determine whether project income or other funds will pay these repairs.)

B. Review available financial information. If applicable, include any recent monthly accounting reports (Forms HUD-93479, 80, 81 or reports comparing budgeted and actual expense) and the MIPS Financial Summary Reports; and the servicer's and IPA's review of the most recent audited annual report.

C. Review any recent GAO/IG reviews of this project or the agent's management procedures for this or other projects.

D. Determine if the owner is requesting any change in the services or equipment to be included in the rent. (See the Rent Schedule and cover letter transmitting owner's rent increase request.)

modifications for type of project and situation by Housing Management Division Directors in accordance with Section 4, paragraph 7-28(C).

1) Compare the project's past and present project expenses. Be concerned if the owner's choice of delivery systems causes higher expenses; (i.e., use of an identity-of-interest company or use of contract rather than project staff to do things that might be done by staff. Relatively high costs or rates of increase can be due to special circumstances (vandalism, large number of evictions, emergency repairs). It is project management which is satisfactory to HUD and "....give specific answers to questions.... relative to the income, assets, liabilities, contracts, operations, and condition of the property....).

2) <u>Review the owner's expense projections.</u> Be flexible, consider the needs of the project, the owner's return on investment and maintaining HUD's security interest. Keep in mind that both underestimating and overestimating expenses can have undesirable impacts. If expenses are underestimated, deferred maintenance and defaults can result. If expenses are overestimated, the rents charged will be higher than needed which could result in HUD paying more subsidy than necessary. If the project charges rents which aren't competitive in the market then vacancies result. This could cause a possible default or an insurance claim. Consider utilizing existing residual receipts to offset repairs not covered by the Reserve for Replacement or other costs that are of one time occurrence. Allow reasonable amounts for inflationary increases. But before doing so assess whether the actual expense base is reasonable for the level maintenance expected during the next year and whether the project is taking reasonable efforts to control costs and is complying with the terms of the Certification in Appendix 3. If the prior period's actual

b) Number of project employees. Number of employees will depend on size and condition of project and whether maintenance or other services are contracted.

c) Salary levels. Salaries should be commensurate with the size of the project and duties required and comparable to similar positions at other similar projects in the same area.

d) Identify-of-interest relationships. Where such relationships exist salary levels should be closely reviewed to ensure they do not exceed rates in arms-length relationships.

3) Office Supplies. Inflationary increases should be allowed if prior year amount was adequate.

4) Legal. If legal expenses are significant, determine reason(s): 1) large number of evictions; 2) above average fees to attorney (may be caused by lack of shopping around for adequate counsel); or 3) including legal services that should be borne by the owner and not the project. Since the amount of legal fees should normally be within owner/agent's control (i.e., effective managers should screen prospective tenants and shop around for reasonably priced legal services), the amount allowed should not exceed the norm for similar projects in similar locations unless there was a problem unique to that project.

5) Auditing. Keep in mind that audit costs can vary according to the type of project and its requirements, the size of the accounting firm and the quality of the project's records and accounting systems. (See page 7-4 of Handbook 4370.4, Basic Accounting Desk Reference for HUD Loan Servicers, for a further discussion of how audit costs vary.) If this project's audit costs are high determine the cause of the higher costs. To

quantity discounts and discounts for early payment of bills. Consider need for supplies and owner/agent efficiency. The budget cost of one-time repairs should be listed under project improvements. The quality of the purchase must be considered when looking at the cost. Purchasing a superior product with a longer life span at a higher cost might very well be more cost effective than purchasing a lower quality item which does not last. Cost is not the only thing you should consider when allowing an expense item.

2) <u>Contracts.</u> Consider the trade off between salary costs and contracts costs. A high level of contract repairs may indicate a need for improved maintenance capability, identify-of-interest relation with vendor, a one-time rehabilitation, or a cost-effective business decision.

3) <u>Security.</u> To determine reasonableness of expense, the Loan Specialist should consider: 1) need for expense, (i.e., is there a security problem), 2) reason for security problem, (i.e., lighting, location, layout of physical structure, or need for better project management); 3) extent to which security problems are within the control of the agent, (i.e., would stricter enforcement of lease provisions reduce security problem); 4) trade off between security services (agents) and security devices (locks, alarms, lighting, etc.); and 5) is security expense cost effective, i.e., does security expense result in reduced turnover and vacancy.

4) <u>Decorating.</u> Determine whether new items should be budgeted under the Reserve for Replacement Account. For example, if an owner requests, a painting reserve can be established (insure monthly payments are adequate). Consider trade offs. Is project using most cost effective decorating items, i.e., would blinds be cheaper than shades in the long run? Are additional decorative items such as drapes needed to improve or maintain occupancy?

residential. Often projects can apply for either residential or commercial rates, whichever will be cheaper).

2) If the owner has taken the action required by the preceding paragraph above, allow rate increases which have been, or are expected to be approved and implemented. Document the rates and effective dates used in your projections.

3) Generally, do <u>NOT</u> project for increased consumption. Consumption should increase only because of severe weather. Project for consumption levels to decrease below prior periods if: The prior period had severe extremes of weather that are not expected to occur during the period the rents will be in effect; or recent energy conservation initiatives can reasonably be expected to reduce consumption levels.

4) THIS PARAGRAPH APPLIES ONLY TO BMIR AND SECTION 236 PROJECTS, PROJECTS THAT RECEIVE RENT SUPPLEMENT, AND PROJECTS THAT CONVERTED FROM RENT SUPPLEMENT TO SECTION 8. Section 329(C) of the 1981 HCDA requires HUD to consider whether the mortgagor could control utility costs by securing more favorable utility rates or undertaking feasible, cost effective actions to increase energy efficiency or energy consumption. Section 329(C) provides that HUD may reduce budgeted utility expenses if the owner has not taken reasonable action to do so. (See 4350.1, Chapter 12 for more guidance on energy conservation measures).

E. <u>Property Tax.</u> Review requirements of Chapter 23, in HUD Handbook 4350.1. Allow only verified increases in rates. If taxes have decreased due to changes in State or local tax laws, use effective rates. Consider also any changes in how the project is evaluated. Even if there is a tax rate decrease, this could be offset by a change in the appraisal process which increased the net value of the project for tax purposes.

F. <u>Mortgage Principal, Interest, MIP.</u> Include principal, interest and any MIP (or service charge on HUD-held mortgages). Use the amount required by the mortgage.

initial equity investment by the rate of return allowed, e.g., 6,8, or 10 percent whichever is appropriate.

J. Project Improvement Needs. Includes: 1) Non-recurring repair expense; 2) amounts needed to correct financial deficiencies; and 3) project improvements. Examples of eligible items include amounts needed to : 1) restore units that have deteriorated to the point they no longer can be rented; 2) correct code violations; and 3) pay accounts payable that affect overall viability of the project (e.g., delinquent utility bills). Ineligible items include luxury improvements such as swimming pools and tennis courts. While HUD does not prescribe a specific dollar amount that may or may not be allowed, the Field Office should keep in mind the following when reviewing project improvement needs requests: 1) amount of lump sum contribution (see Item 2 below); 2) causes of problems and proposals to prevent reoccurrence (for major cost items a MIO plan is recommended); 3) management performance (check prior management review, physical inspection, audit reports); 4) impact on expenditures on rents and subsidy funds and 5) payback or potential benefits from approving the project improvements.

1) Do NOT allow for costs that will be paid from project improvement funds (e.g., Flexible Subsidy or TPA proceeds) or reimbursed from residual receipts or a painting, replacement, or general operating reserve.

2) Owners should: Identify the total cost and scope of work and provide a written schedule for completing any capital improvements included here. List payee's name, purpose, amount and date incurred for each account payable included.

3) Generally, allow amounts to clear accounts payable only on troubled projects having significant operating deficits. Allow for accounts payable only if the project's purchasing procedures are acceptable, expenses are reasonable and management is satisfactory.

4) Prorate capital improvements over an appropriate period of time.

figures adjusted where solid projections are not available.

2) Includes income from all source except: 1) apartment rents, 2) facilities and services (such as furniture, air conditioning) provided by the owner to tenants on a voluntary basis and 3) interest earned on funds invested in replacement and residual receipts reserve accounts. To assess reasonableness, compare with income from prior years.

a) Laundry and Concession Income. Include income from laundry facilities (only if they are leased), parking space and leased commercial space in subsidized projects only (see Section 8). Make appropriate adjustments for existing commercial vacancies.

b) Investment Income

1. Do NOT include security deposit interest that must be paid to tenants or retained in the security deposit account and income that is retained in a painting or replacement reserve or in a residual receipts account.

2. If the project has large reserve balances and interest income is not shown on the HUD-92410 or the owner's budget, ask the owner why the reserves are not invested. While only some projects are required to invest replacement reserves or residual receipts, all projects are encouraged to do so. Paragraph 3 of Mortgagee letter 83-24 tells you which projects must invest and how the interest must be distributed (see Appendix 11). NOTE: Interest income should not be used to reduce expenses for the purpose of granting rent increases.

3. Other Miscellaneous Income. Do NOT include: "excess rents" collected from Section 236 tenants paying above basic rent; (exclude these amounts even if the HUD-93104, Excess Income Report, shows the project is not required to submit excess income to HUD;)

7-31. <u>Quality Control.</u> In order to encourage uniform policy, Branch Chiefs/Supervisors should try as much as is possible to inform their staffs of: any proposed increases in property taxes, payroll taxes, and utility rates; the percentage of any inflationary increases that should be allowed for supplies, etc.; and any property tax abatements for which different types of projects are eligible. When reviewing the administrative process Supervisor/Branch Chief should consider the following.

A. The servicer's comments should be consistent with other information - e.g., project conditions, recent servicing actions taken on this project, tenant comments, the Field Office's experience with this agent?

B. Are the servicer's comments dated and firmly attached to the Rent Computation Worksheet? Do the servicer's comments: explain any significant differences between the owner's and the servicer's income, expense or utility allowance estimates? Do they adequately support the servicer's projections?

C. Are all staff making the same projections as to increases in property taxes, utility rates, and other expenses?

D. Does the servicer's decision letter identify: any physical improvements for which operating funds were budgeted for in the Rent Increase Budget Worksheet; or any special conditions imposed on the owner in conjunction with approval of the rent increase request?

E. Evaluate the rent increase's or utility allowance adjustment's impact on any tenant-based subsidy contract? Are funds available in the current contract? If not, has action been initiated to obtain the necessary funding?

## SECTION 6. COMPUTING RENT POTENTIAL AND UTILITIES

7-32. <u>MAXIMUM ALLOWABLE MONTHLY RENT POTENTIAL.</u> To compute the maximum allowable rent potential, select the

ATTACHED TO THE RENT COMPUTATION WORKSHEET and signed by the Servicer and LMBC.

If HUD's analysis results in a reduction of the rent level requested the owner/manager must be given on opportunity to support their request prior to HUD approving a rent level.

7-35. DETERMINE THE NEW UTILITY ALLOWANCES. Complete the following steps and then enter the new allowances on the Rent computation Worksheet.

A. Review the owner's utility analysis and recommended allowances. (See Section 4, paragraph 7-24(A)) for a description of the information the owner must submit.)

B. Answer the following questions.

1) Are the owner's comments on recent and proposed rate increases consistent with any information you have obtained from other projects, utility suppliers, news report?

2) Has the owner appropriately adjusted for recent and planned rate increases?

3) Has the owner appropriately adjusted consumption estimates to reflect any significant savings likely to result from recent energy conservation effort?

C. If the owner's analysis does not appear to support the request, discuss your concerns with the owner/agent and request additional information, if needed. KEEP IN MIND THAT BOTH UNDERESTIMATING AND OVERESTIMATING CAN HAVE AN ADVERSE IMPACT.

D. You should usually be able to set allowances at the levels recommended by the owner. If you approve utility allowances that deviate from those recommended by the owner, document your reasons for doing so.

C. If the mortgage is HUD-held and <u>delinquent,</u> send the following to your desk officer in the Office of Multifamily Housing Management.

1) Your decision letter;

2) Rent Schedule;

3) Rent Computation Worksheet.

7-37. <u>REVIEW THE OWNER'S SUBMISSION OF THE RENT SCHEDULE (FORM HUD-92458) WHEN THE PROPOSED INCREASE WON'T EXCEED THE HUD APPROVED GROSS RENT POTENTIAL.</u>

A. <u>Proposed rent potential is LESS than or EQUAL</u> to the maximum allowable potential computed on the last Rent Computation Worksheet. The owner should have completed all of the Rent Schedule, except Parts F and I.

1) Check the accuracy of the owner's entries. Be sure: Parts D and E agree with the assumptions you made on the Rent Computation Worksheet regarding non-revenue producing space and commercial space. The effective date is correct.

2) Enter the Maximum Allowable Potential in Part F. (Obtain this amount from the last Rent Increase Worksheet you completed.)

3) Sign and date the Rent Schedule in Part I and distribute it as directed in paragraphs 7-36 (B) and (C) of this section.

7-38. <u>IF THE PROPOSED POTENTIAL EXCEEDS THE MAXIMUM MONTHLY RENT POTENTIAL</u> computed in the last Rent Increase Worksheet, complete columns 3 through 8 of Part A. If the owner will charge the maximum allowable rents, enter the rents computed by the owner in the Rent Increase Worksheet. (NOTE: HUD will prepare the rents by bedroom type in the case of Section 236.) Otherwise, enter the reduced rents you are authorizing the owner to charge. Complete Steps 1, 2 and 3 under the preceding paragraph.

project debt service and operating expenses. (Page 1, Part C of Form 92264 shows how the gross square footage is distributed between residential and commercial space.)

A. Field Offices may authorized project owners to set commercial rents at less than break-even levels if:

1. The owner has taken or is taking all reasonable steps to lease the space at market rents or break-even rates and the reduced rates will not jeopardize the financial condition of the project.

2. The Field Office determines that the proposed use of the space will offer significant benefits to the project and would be more beneficial than other alternatives.

B. Field Offices must NOT approve rents that are less than the market rents for comparable space unless it results in other compensatory financial benefits for the project.

C. Owners must use either the minimum rents required by paragraph 6a or 6b in Part E of the rent schedule. If the owner is recommending a commercial rent that is less than the market rent for comparable space or less than the rent needed to cover the commercial space's share of debt service and operating expenses, the owner must:

1. certify whether there is an identity-of-interest relationship between the operating of the commercial space and the owner, the agent or any principal of either the owner or agent; and

2. Attach the certification of the rent schedule.

D. If owners lease commercial space for periods in excess of 1 years, the lease should provide for any rent increase needed to keep rents at the levels required by this paragraph.

A. Subsidized projects are preempted entirely by the regulations in CFR 24, Part 246 - Local Rent Control.

B. Unsubsidized projects are preempted under the regulations when the Department determines that the delay or decision of the local rent control Board, or other authority regulating rents pursuant to State or local law jeopardizes the Department's economic interest.

All requests for HUD preemption of the local Board's rent controls must be processed in accordance with the procedures discussed in this section.

7-44. PROJECTS AUTOMATICALLY PREEMPTED. This part applies to all projects with mortgages insured or held by HUD that receive a subsidy in the form of:

A. Interest Reduction Payment under Section 236 of National Housing Act.

B. Below Market Interest Rates under Section 221(d)(5) of National Housing Act.

C. Direct Loans at below-market interest rates under Section 202 of the Housing Act of 1959.

D. Rent Supplement Payments under Section 101 of the Housing and Urban Development Act of 1965.

E. Housing Assistance Payments under 24 CFR Part 886.

F. Those units in a project receiving Housing Assistance Payments pursuant to a contract under Section 8 of the United States Housing Act of 1937 or Section 23 of the Act, as in effect before January 1, 1975. Units not assisted are not subject to automatic pre-emption under this part but are covered by paragraph 50 below.

7-45. ACTIONS OWNER MUST TAKE BEFORE SUBMITTING A FORMAL REQUEST FOR PREEXEMPTION OF UNSUBSIDIZED PROJECTS. If an owner decides to request HUD's preemption, the owner must first have asked the local rent control Board for whatever relief or redetermination is permitted under State or local law. The owner's request must advise

3) A copy of the relief application the owner submitted to the Board with supporting documentation.

4) A certified statement which provides for Itemization of resident turnover rates and percentages of rent potential lost to vacancies and to nonpayment of rent on occupied units during the period covered by the Forms HUD-92410 and by the fiscal year preceding those periods. Each type of loss and each fiscal period must be reported separately. The following format is suggested:

| | Since end of Last FY | FY Ending __/__/__ | FY ending __/__/__ |
|---|---|---|---|
| Number of units vacated | ______ | ______ | ______ |
| Percentage of Rent Potential lost to: | | | |
| a) Vacancies | ______% | ______% | ______% |
| b) Collection Loss | ______% | ______% | ______% |

5) A certified statement covering known or approved rate or cost increases or decreases during the 12 months preceding the date of the owner's Notice to Residents. If such changes did occur, the owner must give the date the changes were or will become effective and the old and new rates and provide documentation for following.

a) Property tax assessment or valuation rates;

b) Utility rates;

c) Employee salaries or benefits;

d) Insurance;

e) Contract for services.

has been conveyed to each resident household; and (b) the posted notices were maintained intact and in legible form for the full resident comment period;

3) Copies of the materials submitted in support of the preemption request were located in a place reasonably convenient to residents during normal business hours and at least one evening a week during business hours;

4) Requests by residents to inspect such materials, as provided for in the Notice, were honored; and

5) Copies of all comments received for the residents were considered and are being transmitted to HUD.

E. A cover letter which is signed by the owner and includes a statement that "under the penalties and provisions of Title 18 U.S.C. Section 1001, the statements contained in this application and its attachments have been examined by me and, to the best of my knowledge and belief, are true, correct and complete."

7-49. <u>EVALUATING THE FORMAL REQUEST.</u> HUD must determine if the owner's package includes all of the information required by the previous paragraph and must request any missing materials from the owner. HUD must carefully review any residents comments, the owner's analysis of those comments and any Board decision already received. After reviewing those materials, HUD must within 10 days determine what rent levels are necessary to operate the project.

A. If the rent levels computed by the Field Office are greater than those permitted by the local Board or if the local Board has not yet rendered a decision on the owner's request for relief, the Field Office must discuss the project's needs with the Rent Control Board. If the Field Office and Board are able to reach agreement on a rent level, the Field Office should confirm the agreement in writing and provide the Board and the owner a copy of the agreement. If the Board and the Field

authorized by HUD, HUD will preempt the local Board's requirements on minimum lease terms. Until the project is charging the HUD approved rent potential, the owner may not offer residents leases with terms in excess of one year.

## SECTION 11. PROCEDURES FOR APPEALING BUDGETED RENT INCREASE ADJUSTMENTS

7-52. LEVELS OF APPEAL. There are only two levels of appeal. The first level of appeal is to the HUD Field Office which issured the contested decision. This level of appeal is at least on administrative level above the level which made the final decision on the owner's original submission. (For example, if the rent adjustment letter is signed by the Loan Management Specialist then the next level of appeal is the Branch Chief). The final level of appeal is to the Director, Regional Office of Housing, for the office having jurisdiction over the property.

7-53. IMPLEMENTATION. Owners are permitted to delay implementation of rent changes while the HUD Field Office/Contract Administrator is processing the appeal.

7-54. TENANT NOTIFICATION. Rents resulting from the appeal will be implemented as follows:

A. Projects with 100 percent Section 8

Since Section 8 tenants are not affected by the increase in gross rents, there is no need for the normal 30-day notification period accorded market rate tenants. Owners may bill HUD for the new Section 8 rents on the next regular billing cycle under that contract. They must also comply with Handbook HUD-4350.3, Occupancy Requirements of Subsidized Multifamily Housing Programs, Exhibit 3-4 by completing a new form HUD-50059 and appropriate worksheet.

B. Projects Subject to 24 CFR 245 Tenant Comment Procedures

Owners may implement HUD approved changes in rents only after they have complied with tenant notice requirements and completed any HUD-50059 or

3. Effective Date: Upon Receipt.

4. Filing Instructions:

| Remove: | Insert: |
|---|---|
| Handbook 4350.1, Insured Project Servicing Handbook, dated 9/70, together with all changes. | Handbook 4350.1 REV-1, Multifamily Asset Management and Project Servicing, dated 9/92 |

Assistant Secretary for Housing-
Federal Housing Commissioner

# CHAPTER 7. PROCESSING BUDGETED RENT INCREASES AND FEES FOR COMMERCIAL SPACE AND SERVICES IN INSURED, DIRECT LOAN AND NON-REGULATED HUD PROJECTS

## SECTION 1. OVERVIEW

7-1. PURPOSE. This chapter provides procedures for processing budgeted rent increases in certain HUD projects and outlines guidance in the calculation of utility allowances and charges for commercial facilities and services provided in those projects. Included in the chapter are the relevant tenant participation procedures which must be followed in processing these increases and charges. In preparing the procedures in this chapter, HUD's prime interest is in promoting the efficient management and continued financial viability of its projects. In reviewing requests from owners concerning rents and charges, the Field Office should be guided by the fact that these rents and fees should and must provide sufficient and adequate funding to operate the projects. This chapter gives guidance on program evaluation used in conjunction with required procedures for MIPS budgeted rent increases.

7-2. APPLICABILITY. These procedures for processing a gross potential rent increase, increases in charges for commercial space and charges for services apply to the projects listed below:

A. Section 231, and 221(d)(3) market rate projects: 231 projects (LDs) whose rents are still controlled or who have opted for the alternate rent mechanism.

B. Section 202 projects, except those that use the Section 8 Annual Adjustment Factor (AAF).

C. Section 213, Section 236 (including cooperatives), Rent Supplement, 221(d)(3) market rate and 221(d)(3) BMIR rental and cooperative projects, Sections 810 and 908 (military housing);

D. Projects that have converted from Rent Supplement to Section 8 Loan Management Set-Aside;



EXHIBIT E

E. Previously HUD-owned projects that have been sold to nonprofit owners or that use a budget (rather than the Section 8 AAF) to compute rents;

F. Section 207's and 231's both regulated and controlled by alternative rent mechanism; Section 220 and 221(d)(4)'s that are regulated; and 234 rentals that did not convert to condominiums;

G. Those projects listed in paragraph 7-2(A) through (F) that are not automatically preempted by HUD and request exemption from local rent control.

NOTE: Regulatory agreements require Section 202, Section 231 and cooperative projects to annually submit operating budgets and obtain HUD approval of rents or carrying charges. Field Offices shall enforce this requirement in lieu of the requirement that budgets be submitted only when the owner believes a rent increase is needed.

The Field Office in enforcing the regulatory agreement requirement for annual budget submissions, shall require the owner to include in their submission any information required by Section 4, paragraph 7-22 of these procedures.

7-3. PROJECTS SUBJECT TO THE ALTERNATE RENT DETERMINATION MECHANISM.

For projects insured under Section 207, 231(c)(4), 213 Rental, 223(f), and 234 Rental prior to November 30, 1983, and for 221(d)(4) projects, regardless of when the project was insured, the owners may request an amendment to the Regulatory Agreement subject to Section 3 of this chapter requiring HUD to determine their rents using the alternative rent mechanism described in Section 4.

7-4. DEFINITIONS.

A. HUD Authorized Rent. These are the unit rents shown in column 3 of the most recently approved Rent Schedule (Form HUD-92458). In the Section 236 program these rents are called basic rents. Depending on income, some 236 tenants will pay

decision results in a rent increase, the tenants must be given a 30 day notice before the new rents are effective.

A. The final appeal must be in writing and postmarked within 30 days of the date of the initial appeal decision letter.

B. The owner must send the Director, Regional Office of Housing, the following:

1) A copy of the original decision letter, accompanied by any supporting documentation sent with the original request or involved in the original decision

2) A copy letter explaining why the owner disagrees with the decision on the initial appeal

C. The owner must also send a copy of the letter required in Item B-2 above to the Field Office/Contract Administrator.

D. The owner may request a meeting with the Regional Director of Housing, but such a meeting must be requested and completed during the 30 day final appeal period.

E. The Regional Office will process the appeal within 30 days. The owner may, but is not required to, implement rent adjustments while the Region reviews the appeal. When the Regional Office issues a decision on the final appeal, rents must be implemented as previously described under Paragraph 7-54.

7-57. <u>FURTHER APPEAL</u>. Any decision rendered by the Regional Director of Housing will be final and will not be subject to further appeal above that level.

| Bedrooms | Present rent[1] | | Proposed increase[1] | | Proposed rent[1] | |
|---|---|---|---|---|---|---|
| | Basic | Market | Basic | Market | Basic | Market |
| | $ | $ | $ | $ | | $ |
| 5 | | | | | | |
| 0 | | | | | | |
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |

[1] Separate columns for basic and market rent should be used only for projects assisted under sec. 236 of the National Housing Act. In addition, in projects with more than 1 type of apartment having the same number of bedroom but different rents, each type should be listed separately.

A copy of the materials that we are submitting to HUD in support of our request will be available during normal business hours at [address] for a period of 30 days from the date of service of this notice for inspection and copying by tenants of [name of apartment complex] and, if the tenants wish, by legal or other representatives acting for them individually or as a group.

During a period of 30 days from the date of service of this notice, tenants of [name of apartment complex] may submit written comments on the proposed rent increase to us at [address]. Tenant representatives may assist tenants in preparing those comments. (If, at HUD's request or otherwise, we make any material change during the comment period in the materials available for inspection and copying, we will notify the tenants of the change or changes, and the tenants will have a period of 15 days from the date of service of this additional notice (or the remainder of any applicable comment period, if longer) in which to inspect and copy the materials as changed and to submit comments on the proposed rent increase). These comments will be transmitted to HUD, along with our evaluation of them and our request for the increase. You may also send a copy of your comments directly to HUD at the following address: United States Department of Housing and Urban Development [address of local HUD field office with jurisdiction over rent increases for the project], Attention: Director, Housing Management Division, Re: Project No. [Name of Apartment Complex].

HUD will approve, adjust upward or downward, or disapprove the proposed rent increase upon reviewing the request and comments. When HUD advises us in writing of its decision on our request, you will be notified. If the request is approved, any allowable increase will be put into effect only after a period of at least 30 days from the date you are served with that notice and in accordance with the terms of existing leases.

______________________________

[Name of mortgagor or managing agent]

(b) The mortgagor must comply with all representations made in the notice. The materials to be made available to tenants for inspection and copying are those specified in § 245.315.

§ 245.315 Materials to be submitted to HUD.

When the notice referred to in § 245.310 is served on the tenants, the mortgagor must send to the local HUD office copies of the following documents described in either paragraph (a) or (b) of this section, as specified by the local HUD office:

(a) Documents to be submitted under profit and loss approach:

(1) A copy of the notice to tenants;

(2) An annual Statement of Profit and Loss, Form HUD-92410, covering the project's most recently ended accounting year (this statement must have been audited by an independent public accountant if the project is required by HUD to prepare audited financial statements), and Form HUD-92410 for the intervening period since the date of the last annual statement if more than four months have elapsed since that date;

(3) A narrative statement of the reasons for the requested increase in maximum permissible rents; and

(4) An estimate of the reasonably anticipated increases in project operating costs that will occur within twelve months of the date of submission of materials under this section.

(5) A status report on the project's implementation of its current Energy Conservation Plan.

(b) Documents to be submitted under the forward-budget approach:

the procedural changes made by this section;

(2) The material (including tenant comments) required to be submitted to HUD under §§ 245.315 and 245.320 must be submitted to the State or local agency administering the section 236 assistance or rent supplement assistance contracts, rather than to HUD. An equivalent State or local agency form or standard accounting form may be substituted for the Statement of Profit and Loss, Form HUD-92410 required under § 245.315(a)(2), if approved by the local HUD office; and

(3) The State or local agency must certify that the mortgagor has complied with the requirements of §§ 245.310, 245.315, 245.320, and 245.325.

(b) After the State or local agency has considered the request for an increase in maximum permissible rents that meets the requirements of § 245.320 (including consideration of anticipated cost increases, as provided in § 245.325(a)), it must make a determination to approve, adjust upward or downward, or disapprove the request. If the agency determines to approve or adjust the request, it must submit to the appropriate local HUD office the mortgagor's requests for approval of an increase in maximum permissible rents, along with the comments of the tenants and the mortgagor's evaluation of the comments, and must certify to HUD that the mortgagor is in compliance with the requirements of this subpart. HUD shall review the agency's determination and certification and, within 30 days of their submission to HUD, notify the agency of its approval, adjustment upward or downward, or disapproval of the proposed rent increase. HUD will not unreasonably withhold approval of a rent increase approved by the State or local agency.

(c) If the agency determines to disapprove the request, there is no HUD review of the agency's determination.

(d) The agency must notify the mortgagor of the final disposition of the request, and it must furnish the mortgagor with a written statement of the reasons for its approval, adjustment, or disapproval. The mortgagor must make the reasons for approval, adjustment or disapproval known to the tenants, by service of notice on them as provided in § 245.15.

## Subpart E—Procedures for Requesting Approval of a Conversion From Project-Paid Utilities to Tenant-Paid Utilities or of a Reduction in Tenant Utility Allowances

SOURCE: 50 FR 32404, Aug. 12, 1985, unless otherwise noted.

### § 245.405 Applicability of subpart.

The requirements of this subpart apply to any request by a mortgagor covered by § 245.10* for HUD approval of the conversion of a project from project-paid utilities to tenant-paid utilities, or of a reduction in tenant utility allowances.

### § 245.410 Notice to tenants.

At least 30 days before submitting a request to HUD for approval of a conversion from project-paid utilities to tenant-paid utilities, or of a reduction in tenant utility allowances, the mortgagor must serve notice of the proposed conversion or reduction on the project tenants, as provided in § 245.15. The notice shall state the following:

(a) That the mortgagor intends to submit a request to HUD for approval of conversion from project-paid utilities to tenant-paid utilities, or of a reduction of tenant utility allowances;

(b) That the tenants have the right to participate as provided in § 245.420, and what those rights are, including the address at which the material required to be made available for inspection and copying under that section are to be kept;

(c) That tenant comments on the proposed conversion of reduction may be sent to the mortgagor at a specified address or directly to the local HUD office, and that comments sent to the mortgagor will be transmitted to HUD, along with the mortgagor's evaluation of them, when the request for HUD's

*EDITORIAL NOTE: Section 245.10 was redesignated as § 245.105 at 50 FR 32403, Aug. 12, 1985.

comment period in the materials submitted to HUD pursuant to § 245.415, the mortgagor must notify the tenants of the change, in the manner provided in § 245.15, and make the materials as changed available for inspection and copying at the address specified in the notice for this purpose. The tenants have a period of 15 days from the date of service of this additional notice (or the remainder of any applicable comment period, if longer) in which to inspect and copy the materials as changed and to submit comments on the proposed conversion or reduction, before the mortgagor may submit its request to HUD for approval of the conversion or reduction.

§ 245.425 Submission of request for approval to HUD.

Upon completion of the tenant comment period, the mortgagor must review the comments submitted by tenants and their representatives and prepare a written evaluation of the comments. The mortgagor must then submit the following materials to the local HUD office:

(a) The mortgagor's written request for HUD approval of a conversion from project-paid utilities to tenant-paid utilities, or of a reduction in tenant utility allowances;

(b) Copies of all written tenant comments;

(c) The mortgagor's evaluation of the tenant comments on the proposed conversion or reduction;

(d) A certification by the mortgagor that it has complied with all of the requirements of §§ 245.410, 245.415 and 245.420, and this section; and

(e) Such additional materials as HUD may have specified in writing.

(Approved by the Office of Management and Budget under control number 2502-0310)

§ 245.430 Decision on request for approval.

(a) After consideration of the mortgagor's request for approval and the materials submitted in connection with the request, HUD must notify the mortgagor in writing of its approval or disapproval of the proposed conversion or of its approval, adjustment upward or downward, or disapproval of the proposed reduction, providing its reasons for such determination.

(b) The mortgagor must notify the tenants of HUD's decision in the manner provided in § 245.15. If HUD has approved the proposed conversion or a reduction (as originally proposed or as adjusted), the notice must state:

(1) The amount of the rent to be paid to the mortgagor and the utility allowance for each unit; and

(2) The effective date of the conversion or reduction (which must be at least 30 days from the date of service of the notice and in accordance with the terms of existing leases).

§ 245.435 Non-insured projects.

(a) In the case of a proposed conversion or reduction involving a project that is assisted under section 236 of the National Housing Act or section 101 of the Housing and Urban Development Act of 1965 but that does not have a mortgage insured by HUD or held by the Secretary, the provisions of this section and of §§ 245.405 through 245.425 apply to the mortgagor (project owner), except that—

(1) The notice to tenants required under § 245.410 must be modified to reflect the procedural changes made by this section;

(2) The materials (including tenant comments) required to be submitted to HUD under §§ 245.415 and 245.425 must be submitted to the State or local agency administering the section 236 assistance or rent supplement assistance contracts, rather than to HUD; and

(3) The State or local agency must certify that the mortgagor has complied with the requirements of §§ 245.410, 245.415, 245.420, and 245.425.

(b) After the State or local agency has considered the request for approval of a conversion or reduction that meets the requirements of § 245.425, it must make a determination to approve or disapprove the conversion, or to approve, adjust upward or downward, or disapprove the reduction. If the agency determines to approve the conversion or reduction (as originally proposed or as adjusted), it must submit to the appropriate local HUD office



311-073 0—92——25

4350.1 REV-1

APPENDIX 2

OWNER'S CERTIFICATION AS TO COMPLIANCE WITH TENANT COMMENT PROCEDURES IN 24 CFR 245 (FORMERLY IN 24 CFR 401)

Project Name __________________ FHA or Non-Insured Project No. ________

Acting on behalf of __________________________, the Project Owner, I certify that project management has taken ALL of the actions listed below.

1) Distributed a Notice to Tenants, in the forms and manner required by 24 CFR 245.310 and 245.410. (24 CFR 245.410 applies only if a reduction in utility allowances is proposed.)
2) Took reasonable steps to assure that any posted Notices remained intact and in legible form for the full comment period required by 24 CFR 245.
3) Made all materials submitted to justify the increase available during normal business hours in a place reasonably convenient to project residents.
4) Honored any resident's request to inspect those materials.
5) Reviewed and evaluated all comments received from project residents or their authorized representatives.
6) Examined all materials submitted to HUD/the State Agency in support of the rent increase request.

I also certify, that all information submitted with my rent increase request is true, correct and complete.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than 5 years, or both.

Signed by:

__________________________
Name

__________________________
Title

__________________________
Signature Date

WARNING:

- 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than 5 years, or both.

- 12 U.S.C. 1715z-4 provides in part: "Whoever, as an owner of a property which is security for a mortgage (covering multifamily housing, as defined in the regulations of the Secretary) or as a stockholder beneficial owner ... trust ... or as an officer, director or agent of any such owner (1) willfully uses or authorizes use of any part of the rents or other funds derived from the property covered by such mortgage in violation of a regulation ... (2) willfully and knowingly uses or authorizes the use, while such mortgage is in default, of any part of the rents or expense ... shall be fined not more than $5,000 or imprisoned not more than 3 years or both

Signed by:

Name ______________________ Title ______________________

Signature ______________________ Date ______________________

SAMPLE

Owner Explanation of Income and Expense Estimates

6210 - Advertising and Renting Expense. This includes: 1) $200 for periodic ads in local newspaper; and 2) the cost of credit reports on new applicants.

6351 - Bookkeeping Payroll and Services. Includes this project's share of centralized accounting operation. Costs are prorated over all of the 20 projects managed by our agent, Professional Management, Inc. Costs are prorated according to each project's relative volume of transactions.

6310 - Clerical and Occupancy Salaries. Includes one-fourth of one occupancy clerk's time. Occupancy clerk also works for XYZ Apartments and Evergreen Apartments.

6311 - Office Supplies. Projects a 4 percent inflationary increase over the prior year's actual expense.

6330 - Manager's Salary. Includes manager's salary plus contract rent on a 2-bedroom apartment. As payroll schedule shows, manager will receive a $100 per month increase for cost-of-living and performance bonuses.

6340 - Legal. This represents retainer for an attorney who handles all routine project matters. This is less than last year's actual expense. Last year, a larger than usual number of evictions were required because of the former agent's failure to effectively screen applicants. That agent was removed 6 months ago.

6350- Auditing. Represents the contract price for the annual audit required by Handbook 2000.4. After obtaining proposals from two other firms, we executed a contract with Jones and Smith, Inc. Their bid was $1,200 less than the other bids and we understand that HUD Field Offices have found their work acceptable.

6360 - Telephone and Answering Services. Includes local telephone service and answering service for evenings and Sunday. Allows for $15 per month increase in

6525 - **Trash Removal**. Contract rate increased by $30 to $380/month, effective last May. This increase is partly reflected in the partial year's HUD-92410 and fully reflected in the budget. Trash is removed twice a week.

6530 - **Security**. Cost of new deadbolt locks for 15 units on Evans Street. There have been several break-ins at single family homes near that side of the project. We also have asked the police department to increase patrols in that area.

6537 - **Grounds**. Contract with Evergreen Grounds covers supplies and labor at $6,000/year. Contract expires in December 1986.

6560 - **Decorating and Interior Painting**. Represents cost of repainting 12 units. Apartments of long-term residents are repainted every 4 years. Replacement reserves will pay for any needed drapery or carpet replacement.

6541 - **Repairs Materials**. Represents last year's repairs plus a 4 percent inflationary increase. None of the prior period's repair expenses were reimbursed out of replacement reserves; all were routine repairs.

6540 - **Repairs Payroll**. Includes; a) salary expense for two maintenance men at rates shown in the attached payroll schedule; and b) a 50 percent discount on one maintenance men's rent.

6710 - **Property Taxes**. The county has increased the assessed value by 5 percent; tax rate in unchanged. Two years ago, we successfully appealed the county's calculation of the project's assessed value. At that time, the calculation has used incorrect assumptions on income and expense levels. Since the new, increased assessed value used the revised assumptions agreed to in the appeal, we are accepting the assessed value as accurate.

6711 - **Payroll Taxes**. Budgeted at 11 percent (6.7 percent FICA, 4.3 percent combined State and Federal unemployment) of salaries listed in the attached

Vacancy Loss. Decreased from prior year because we expect new agent to reduce tenant turnover and more aggressively market units.

Management Fees. Will request a one-half percent increase in fees, effective March 1, 1983, if new agent performs as expected. Agent has already made significant progress in turning the project around.

NOTE: Line items should reference the specific HUD-92410 Account Code. Where the increase is less that 5 percent, no justification is required. Capital expenditures should not be included in 92410 line item Budget but in other Cash expense.

If the rent increase is based on capital expenditures (non-reoccurring) a reserve analysis should be included.

4350.1 REV-1

APPENDIX 4d

# Budget Worksheet
## Income and Expense Projections

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0324 (exp. 3/31/92)

Public reporting burden for this collection of information is estimated to average 2.0 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Officer, Office of Information Policies and Systems, U.S. Department of Housing and Urban Development, Washington, D.C. 20410-3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502-0324), Washington, D.C. 20503. Do not send this completed form to either of the above addresses.

Project Number: | Name of Project:

| Description of Account | | Acct No. | HUD-92410 audited last FY | Current FY ( no. of mos: ) | Budget from ( ) to ( ) |
|---|---|---|---|---|---|
| Rental Income 5100 | Apartments or Member Carrying Charges (Coops) | 5120 | | | |
| | Tenant Assistance Payments | 5121 | | | |
| | Furniture and Equipment | 5130 | | | |
| | Stores and Commercial | 5140 | | | |
| | Garage and Parking Spaces | 5170 | | | |
| | Flexible Subsidy Income | 5180 | | | |
| | Miscellaneous (specify) | 5190 | | | |
| | Total Rent Revenue Potential at 100% Occupancy | | | | |
| Vacancies 5200 | Apartments | 5220 | | | |
| | Furniture and Equipment | 5230 | | | |
| | Stores and Commercial | 5240 | | | |
| | Garage and Parking Spaces | 5270 | | | |
| | Miscellaneous (specify) | 5290 | | | |
| | Total Vacancies | | | | |
| | Net Rental Revenue (Rent Revenue less Vacancies) | | | | |
| Elderly & Congregate Srvcs. Income 5300 | | 5300 | | | |
| | Total Service Income (schedule attached) | | | | |
| Financial Revenue 5400 | Interest Income-Project Operations | 5410 | | | |
| | Income from Investments-Residual Receipts | 5430 | | | |
| | Income form Investments-Reserve for Replacement | 5440 | | | |
| | Income from Investments-Miscellaneous | 5490 | | | |
| | Total Financial Revenue | | | | |
| Other Revenue 5900 | Laundry and Vending | 5910 | | | |
| | NSF and Late Charges | 5920 | | | |
| | Damages and Cleaning Fees | 5930 | | | |
| | Forfeited Tenant Security Deposits | 5940 | | | |
| | Other Revenue (specify) | 5990 | | | |
| | Total Other Revenue | | | | |
| | **Total Revenue** | | | | |
| Administrative Expenses 6200/6300 | Advertising | 6210 | | | |
| | Other Renting Expense | 6250 | | | |
| | Office Salaries | 6310 | | | |
| | Office Supplies | 6311 | | | |
| | Office or Model Apartment Rent | 6312 | | | |
| | Management Fee | 6320 | | | |
| | Manager or Superintendent Salaries | 6330 | | | |
| | Manager or Superintendent Rent Free Unit | 6331 | | | |
| | Legal Expenses (Project) | 6340 | | | |
| | Auditing Expenses (Project) | 6350 | | | |
| | Bookkeeping Fees/Accounting Services | 6351 | | | |
| | Telephone and Answering Services | 6360 | | | |
| | Miscellaneous Administrative Expenses (specify) | 6390 | | | |
| | Total Administrative Expenses | | | | |
| | Sub Total Expenses (carry forward to page 2) | | | | |

Previous editions are obsolete



form HUD-92547-A (2/92)

RENT COMPUTATION WORKSHEET

INSTRUCTIONS FOR COMPLETION

A. Enter the following

1. Project Name.

2. FHA Number.

3. Management Agent.

4. Management Fee- Enter percent or PUPM Fee if capped- Information can be obtained from Management Certification.

5. Initial Mortgage - For 236's 221(d)(3) and 202's.

6. Replacement Cost for 221(d)(4)'s, 207 and 231's.

7. Modified Mortgage - If modified indicate YES and enter Debt Service (P & I and MIP).

8. Under workout - If project under workout enter YES and workout Payment and ending date.

9. Initial Equity - Enter for 236's and 221(d)(3) only.

10. Debt Service Rate - Enter for 221(d)(3)'s, 207's, 221(d)(4)'s, 231's and 202's.

B. Compute the following

1. Box A - Substitute requested valves and compute Debt Service that will be allowed

   a) Use formula that pertains to specific section of Act.

   b) Deregulated projects under alternative mechanism insure you enter appraised Replacement Cost.

   c) 207's, 221(d) (4) and 231's not deregulated add 2 percent mortgage to Replacement Cost.

b) New Market Potential equals new Authorized Potential plus HUD subsidy.

c) Market Rent Ratio equals new Market Potential divided by new Authorized Potential.

7. Unit Rent Computations, Box H

a) Authorized Rent levels - for each unit type multiply current unit rent by percent increase.

b) Market Rate (236 projects only) multiply Authorized Rent times Market Rent Ratio.

**BOX B** DISTRIBUTION COMPUTATION

236/221(d)(3) = Initial Equity x .06 ____________

207/231/221(d)(4) = Allowance calculated in conjunction with Debt Service

INCOME RESERVE (NON-PROFITS)

236 NP = Mortgage Payment x .06393 ____________

221(d)(3) NP = Mortgage Payment x .05263 ____________

**BOX C** RENT POTENTIAL COMPUTATION

Allowed Expenses ____________

less Management ( ____________ )

Plus

Reserves ____________

Debt Service ____________

Return/Net Income Reserve ____________

Total Cash less Management ____________

**BOX D** MANAGEMENT/VACANCY FACTOR

Authorized Management Fee ____________ % (1)

Allowed Vacancy Percent ____________ (5% or 7%)

Factor = (1 - Management Fee) x (1 - Vacancy)

(1) PUPM Cap (Y/N) ________

If yes Fee = 0

Allowed PUPM ____________

**BOX E**

RENT POTENTIAL = Total Cash divided by Factor (Box D above)

(No PUPM Cap)

RENT POTENTIAL (PUPM Cap) = Total Cash/Factor + (PUPM Management Fee x 12 x Number of Units)

MARKET RENT (236 ONLY)

| | | | | | |
|---|---|---|---|---|---|
| Authorized Unit Rent | | | | | |
| Market Ratio | | | | | |
| New Market Rent | | | | | |

UTILITY ALLOWANCES

| | | | | | |
|---|---|---|---|---|---|
| Current Utility Allowances | | | | | |
| Approved Utility Allowances | | | | | |

AMENDMENT TO REGULATORY AGREEMENT FOR SECTION 220 AND 221(d)(4) PROJECTS (FORMS 92466)

4. (a) The owner shall not rent the units for a period of less than thirty (30) days. Commercial facilities shall be rented for such use and upon such terms as determined by the owner. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of the owner and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, owner shall immediately demand cancellation and notify the Secretary thereof.

* (For projects constructed for family use and do not have a Section 8 Contract.)

(b) Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the owner for any rental accommodations, facilities and/or services which may be furnished by the Owner or others to such tenant upon his request.

* (For projects constructed exclusively for handicapped tenants or who receive assistance under Section 8.)

(b) Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and owner for accommodations. Tenants receiving Section 8 assistance shall have their rents determined by the HAP Contract. No charge shall be made, however, for facilities or services without the approval of the Secretary.

(c) In the event the project is under jurisdiction of a local rent control law or ordinance and the owner desires the Secretary to preempt those controls, the owner shall comply with applicable regulations or instructions in effect at the time of application or preemption, currently 24 CFR Part 246, Subpart B.

* Delete the paragraph which does not pertain to the project at hand. Do not delete paragraphs (a) and (b). Your choice is limited to (b).

ADDENDUM TO REGULATORY AGREEMENT AND/OR CORPORATE CHARTER FOR 207, 223(f), 608, 213 RENTAL, 234 RENTAL, 803, 810, 231(c)4 OR OWNERS OF 220 OR 221(D) (4) PROJECTS WHOSE OWNERS CHOOSE THE ALTERNATE METHOD

Paragraph ____________________ of the Regulatory Agreement (Corporate Charter) ____________________ dated ____________ in connection with FHA Project No. __________ is hereby amended by adding the following:

As an alternative to the determination of rents by the Secretary based on increases in taxes and operating and maintenance costs, the owner may request and the Secretary shall approve rent levels determined by the owner, provided that:

1. The owner submits a certified appraisal of the property as a rental project.

2. The owner provided a schedule of proposed unit rents and gross potential income.

3. The owner for the initial determination shall provide an appraisal conducted by a licensed appraiser of the property (based on its use as residential rental property) which includes a rental analysis of comparable conventionally financed rental properties in the area and which shows the proposed rent. For subsequent submissions, the owner may use a qualified appraiser, a certified public accountant, or a certified member of a national housing management organization to perform the rental analysis.

4. The owner agrees that if any units in a project are assisted under the United States Housing Act of 1937, the determination of rent levels for those units receiving such assistance shall be processed in accordance with the applicable section of that Act.

5. Upon request by the owner, and provided there are no violations of this agreement, the Secretary shall approve rental rates based on the lesser of the following methods:

   A) By using the sum of the operating costs as determined by the Secretary and the amount derived by multiplying

## PART 246—LOCAL RENT CONTROL

Subpart A—General Provisions

Sec.
246.1 Scope and effect of regulations.

Subpart B—Unsubsidized Insured Projects

246.4 Applicability.
246.5 Rental charges.
246.6 Initiation.
246.7 Notice to tenants.
246.8 Materials to be submitted to HUD in support of preemption request.
246.9 Request for preemption.
246.10 HUD procedures.
246.11 Notification of action on preemption requests.
246.12 Preemption of prospective term of lease.

Subpart C—Subsidized Insured Projects

246.20 Applicability.
246.21 Rental charges.
246.22 Procedures.

Subpart D—HUD-Owned Projects

246.30 Rental charges.
246.31 Procedures.

AUTHORITY: Sec. 211, National Housing Act (12 U.S.C. 1715b); sec. 7(d), Department of Housing and Urban Development Act (42 U.S.C. 3535(d)).

### Subpart A—General Provisions

**§ 246.1 Scope and effect of regulations.**

(a) The regulation of rents for a project coming within the scope of "Subpart B—Unsubsidized Insured Projects" is preempted under these regulations only when the Department determines that the delay or decision of the local rent control board, or other authority regulating rents pursuant to state or local law (hereinafter referred to as board) jeopardizes the Department's economic interest in a project covered by that subpart. The regulation of rents for projects coming within the scope of "Subpart C—Subsidized Insured Projects" is preempted in its entirety by the promulgation of these regulations. The regulation of rents for projects coming within the scope of "Subpart D—HUD-Owned Projects" rests within the exclusive jurisdiction of the Department.

(b) Any state or local law, ordinance, or regulation is without force and effect insofar as it purports to regulate rents of: (1) Projects for which a determination of preemption has been made pursuant to subpart B, or (2) projects coming within the scope of subpart C or D. Compliance with such law, ordinance, or regulation shall not be required as a condition of, or prerequisite to, the remedy of eviction, and any law, ordinance, or regulation which purports to require such compliance is similarly without force and effect.

(c) It is the purpose of the Department that these regulations shall bar all actions of a board that would in any way frustrate the purpose or effect of these regulations or that would in any way delay, prevent or interfere with the implementation of any increase in rental charges approved by HUD.

(d) These regulations may be offered as a defense to a proceeding by whomever initiated, which may be brought or threatened to be brought against any owner, mortgagor or managing agent of a project subject to these regulations who demands, receives or retains, or seeks to demand, receive or retain, rental charges approved by HUD, or as a basis for declaratory, injunctive or other relief against any person or agency, public or private, who attempts to enforce, or threatens to enforce, any state or local law, ordinance, or regulation which is without force and effect by reason of this regulation.

[40 FR 49318, Oct. 22, 1975. Redesignated at 49 FR 6713, Feb. 23, 1984]

will be available during normal business hours as well as one evening a week after business hours which will be (Day) at (Address) for a period of 30 days from the date of this Notice. The materials may be inspected and copied by tenants of (Name of Apartment Complex and HUD Project No.) and if the tenants wish, by legal or other representatives duly authorized in writing to act for one or more of the tenants.

During a period of 30 days from the date of this notice, tenants of (Name of Apartment Complex and HUD Project No.) may submit written comments on the proposed preemption request to us at (Address). Tenant representatives may assist tenants in preparing those comments. The inspection and comment period will be extended as necessary to (a) assure a 30-day comment period on a complete mortgagor's submission and (b) to allow at least 5 days to comment on any written decision made by the board. If the decision is received by the mortgagor on or before the expiration of the thirty-day period and it was not available to the tenants during the first 25 days of the 30-day period. These comments will be transmitted to HUD, along with our evaluation of them and our preemption request. You may also send a copy of your comments directly to HUD at the following address: United States Department of Housing and Urban Development, (address of local HUD field office with jurisdiction over preemption of rents for the project) Attention: Director, Housing Re: (Project No.) and (Name of Apartment Complex). HUD will approve or diapprove the preemption request in whole or in part upon reviewing the materials and comments. When HUD advises us in writing of its decision on our request, you will be notified at least 30 days before any change in the rental structure is put into effect, in accordance with the terms of existing leases.

______________________________

(Name of mortgagor or managing agent)

The mortgagor shall comply with all representations made in this Notice.

**§ 246.8 Materials to be submitted to HUD in support of the preemption request.**

(a) After posting or delivery of the Notice as required by § 246.7, the mortgagor shall immediately send HUD notification of its intention to file a preemption request, to include:

(1) The written Notice to the tenants, which will state the date of its posting and distribution.

(2) An annual Statement of Profit and Loss, on a form prescribed by the Commissioner, audited by an independent public accountant and covering the most recently ended accounting year, and if more than four months have elapsed since the date of the Profit and Loss Statement, an unaudited accrual Profit and Loss Statement on a form prescribed by the Commissioner for the intervening period since the date of the annual statement, with the mortgagor's certification as to its accuracy.

(3) A certified statement which provides a separate breakdown for the percentage of vacancies for the present and previous year.

(4) A certified statement which provides a separate breakdown of the actual rent loss due to nonpayment of rent for the past 2 years.

(5) A certified statement which provides a separate breakdown of rent loss due to tenant turnover for the past 2 years.

(6) A certified statement covering known approved rate or cost increases not yet experienced by the project which can be documented by the following:

(i) Tax rates or appraisals.

(ii) Utility rates.

(iii) Contracts for employees or services.

(iv) Insurance, and

(7) A certified statement covering known decreases of rates or costs not yet experienced by the project which have been approved and can be documented as follows:

(i) Tax rates or appraisals.

(ii) Utility rates.

(iii) Contracts for employees or services.

(iv) Insurance.

If there are none, the mortgagor must so certify.

(8) A copy of the full application to the board with supporting documentation.

(b) The local HUD office shall review the mortgagor's submission promptly upon receipt, to ascertain that it is complete as required by paragraph (a) of this section. Should the submission be found to be incomplete, the local HUD office shall notify the mortgagor within 48 hours of the review of its determination that further material is necessary to consti-

**§ 246.11 Notification of action on preemption request.**

(a) After HUD has considered the preemption request which meets the requirements of § 246.9 and has made its determination to approve or disapprove the request, it will furnish the mortgagor with a written statement of the reasons for approval or disapproval. The mortgagor shall make known to tenants, by posting or delivery in the manner outlined in § 246.7, the reasons for approval or disapproval.

(b) The mortgagor may effect collection of the HUD-approved income level which is set at the time of the preemption determination after the expiration of 30-days notice to the tenants, subject to the terms and rights a tenant may have under the existing lease.

(c) Once the project reaches the income level approved under these procedures, the project will be returned to the control of the local rent control board covering both the rents and the terms of prospective leases.

**§ 246.12 Preemption of prospective term of lease.**

(a) In those instances where it will take more than 60 days (2 months) for the project to reach the new income levels, HUD preemption of prospective lease terms shall be effective for those new or renewed leases which by regulation of a local rent control board would require the mortgagor to offer a lease for a term in excess of one year.

(b) As a condition for HUD preemption, the mortgagor must give only one-year leases to tenants whose leases expire during the preemption period.

## Subpart C—Subsidized Insured Projects

**§ 246.20 Applicability.**

This subpart applies to all projects with mortgages insured or held by HUD that receive a subsidy in the form of (a) interest reduction payments under section 236 of the National Housing Act; (b) below-market interest rates under sections 221(d) (3) and (5) of the National Housing Act; (c) direct loans at below-market interest rates under section 202 of the Housing Act of 1959; (d) rent supplement payments under section 101 of the Housing and Urban Development Act of 1965; (e) housing assistance payments under 24 CFR part 886, subpart A (Section 8 Loan Management Set Aside), for projects that converted their rent supplement contracts under section 101 of the Housing and Urban Development Act of 1965 to such assistance for the term of the HAP contract; or (f) housing assistance payments pursuant to a contract covering all the units in the project under section 8 of the United States Housing Act of 1937 or section 23 of that Act, as in effect before January 1, 1975. This subpart also applies to projects with mortgages insured or held by HUD that receive housing assistance payments pursuant to a contract covering fewer than all units in the project, but only with respect to those units occupied by tenants receiving housing assistance thereunder.

[51 FR 20273, June 18, 1986]

**§ 246.21 Rental charges.**

The Department finds that it is necessary and desirable to minimize defaults by the mortgagor in its financial obligations with regard to projects covered by this subpart, and to assist mortgagors to preserve the continued viability of those projects as a housing resource for low-income families. The Department also finds that it is necessary and desirable to protect the substantial economic interest of the Federal Government in those projects. Therefore, the Department concludes that it is in the national interest to preempt, and it does hereby preempt, the entire field of rent regulation by local rent control boards, (hereinafter referred to as board), or other authority, acting pursuant to state or local law as it affects projects covered by this subpart.

[40 FR 49318, Oct. 22, 1975. Redesignated at 44 FR 58506, Oct. 10, 1979, and at 49 FR 6713, Feb. 23, 1984]

**§ 246.22 Procedures.**

(a) The mortgagor shall file its application for approval of increases in

Mortgagee Letter 83-24

October 25, 1983

MEMORANDUM FOR: ALL APPROVED MORTGAGEES

ATTENTION: Multifamily Mortgagees

FROM: W. Calvert Brand, General Deputy Assistant Secretary

SUBJECT: Requirements for Multifamily Insured Projects

1. Property Insurance Requirements
2. Increases in Replacement Reserve Deposits
3. Investment of Replacement Reserves and Residual Receipts
4. Distribution of Form HUD-9807, Request for Termination of Multifamily Mortgage Insurance

1. <u>Clarification of Property Insurance Requirements.</u> 24 CFR 207.260(c) requires that all projects encumbered by FHA insured mortgages must carry hazard insurance policies which meet the requirements of the Federal Housing Commissioner. Since those regulations also make mortgagees responsible for monitoring the adequacy of the coverage and for obtaining insurance when mortgagors fail to do so, several mortgage companies have asked the Department to clarify its insurance requirements for multifamily projects. That clarification follows.

Section 207.10 of the Regulations requires that multifamily projects carry a fire and extended coverage insurance policy in an amount that meets the coinsurance requirements of the insurer and is at least equal to 80 percent of the actual cash value of the project's insurable improvements and equipment. These insurance requirements apply as long as the mortgage is insured by HUD and regardless of the unpaid principal balance of the mortgage. To determine the amount of insurance required at project completion, mortgagees must use the estimate of insurable value shown in construction costs that have occurred since project completion. After the first year of project operation, HUD will consider insurance coverage to be adequate if the insurance coverage met the insurer's coinsurance requirements at the time the policy was issued and: